**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| TREVOR DELLNO KEETH,<br><br>               Plaintiff,<br><br>   v.<br><br>JAMES R. JARMUSCH, and FOCUS<br>FEATURES, LLC,<br><br>               Defendants. | Civil Action No. 1:25-cv-07221-KPF |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT**

---

**FOX ROTHSCHILD LLP**
101 Park Avenue, Suite 1700
New York, NY 10178
(212) 878-7900

10250 Constellation Blvd.,
Suite 900
Los Angeles, CA 90067
(310) 598-4150

*Counsel for Defendants*

On the Brief:
    David Aronoff, admitted *pro hac vice*
    Joshua Bornstein, admitted *pro hac vice*
    Andrew Ramstad, Bar No. 5929583

# **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    BACKGROUND .......................................................................................... 3

    A.    PROCEDURAL HISTORY................................................................ 3

    B.    ALLEGATIONS OF THE TAC........................................................ 4

    C.    THE WORKS AT ISSUE.................................................................. 5

        1.    Summary of Defendants' Work .................................................. 5

        2.    Summary of Plaintiff's Work...................................................... 8

III.   LEGAL STANDARD.................................................................................. 11

IV.   ARGUMENT .............................................................................................. 12

    A.    THE TAC FAILS TO PLAUSIBLY ALLEGE COPYING ............................... 13

        1.    The TAC Fails to Plausibly Allege Access................................ 13

        2.    The TAC Does Not Allege Striking Similarity Nor Could It ................... 15

    B.    SUBSTANTIAL SIMILARITY IS NOT PLAUSIBLY ALLEGED.................... 16

        1.    The "Total Concept and Feel" of the Two Works Is Entirely Different... 18

        2.    The Two Works Have Dramatically Divergent Themes .......................... 19

        3.    The Characters in the Two Works Are Wholly Dissimilar....................... 20

        4.    Plot and Sequence of Events Are Not Substantially Similar .................... 23

        5.    Pace and Setting Reinforce the Absence of Substantial Similarity .......... 25

        6.    Summary of the More Discerning Observer Test Factors ........................ 26

V.    CONCLUSION............................................................................................ 27

183190434

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdin v. CBS Broad. Inc.*,
  971 F.3d 57 (2d Cir. 2020)............................................................................12, 17

*Allen v. Scholastic Inc.*,
  739 F. Supp. 2d 642 (S.D.N.Y. 2011)..........................................................20, 24

*Arden v. Columbia Pictures Indus., Inc.*,
  908 F. Supp. 1248 (S.D.N.Y. 1995).....................................................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................11

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 554 (2007)............................................................................................11

*Boisson v. Banian, Ltd.*,
  273 F.3d 262 (2d Cir. 2001)..........................................................................16, 17

*Capcom Co., Ltd. v. MKR Group, Inc.*,
  No. 08-0904 RS, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008) ...........17, 18, 23, 26

*Castro v. Cusack*,
  No. 15CV6714ENVLB, 2019 WL 3385218 (E.D.N.Y. July 26, 2019) ...................15

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ..............................................................................23

*CK Co. v. Burger King Corp.*,
  No. 92 CIV. 1488 (CSH), 1994 WL 533253 (S.D.N.Y. Sept. 30, 1994) ...............23

*Clanton v. UMG Recordings, Inc.*,
  556 F. Supp. 3d 322 (S.D.N.Y. 2021)..................................................................15

*Cox v. Abrams*,
  No. 93 CIV. 6899 (RJW), 1997 WL 251532 (S.D.N.Y. May 14, 1997)................16

*Edwards v. Raymond*,
  22 F. Supp. 3d 293 (S.D.N.Y. 2014)....................................................................17

*Effie Film, LLC v. Pomerance*,
  909 F. Supp. 2d 273 (S.D.N.Y. 2012)..............................................................17, 19

iii

183190434

*Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*,
 No. 16-CV-9987 (PKC), 2019 WL 1382341 (S.D.N.Y. Mar. 27, 2019)................................13

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
 586 U.S. 296 (2019)........................................................................................................12

*Gallop v. Cheney*,
 642 F.3d 364 (2d Cir. 2011).............................................................................................11

*Greene v. Warner Music Grp.*,
 No. 23 CIV. 1555 (KPF), 2024 WL 3045966 (S.D.N.Y. June 18, 2024).........................11, 12

*Hogan v. DC Comics*,
 48 F. Supp. 2d 298 (S.D.N.Y. 1999)..........................................................................20, 22, 23

*Hudson v. Universal Studios, Inc.*,
 No. 04 CIV 6997(GEL), 2008 WL 4701488 (S.D.N.Y. Oct. 23, 2008)................18, 20, 21, 22

*Jones v. Atl. Recs.*,
 No. 22-CV-893 (ALC), 2023 WL 5577282 (S.D.N.Y. Aug. 29, 2023) ................................15

*Jones v. CBS, Inc.*,
 733 F. Supp. 748 (S.D.N.Y. 1990) ......................................................................................23

*Jorgensen v. Epic/Sony Recs.*,
 351 F.3d 46 (2d Cir. 2003)..........................................................................................13, 15

*Klauber Bros., Inc. v. URBN US Retail LLC*,
 No. 1:21-CV-4526-GHW, 2023 WL 1818472 (S.D.N.Y. Feb. 8, 2023)................................14

*Klauber Bros. v. Bon-Ton Stores, Inc.*,
 557 F. App'x 77 (2d Cir. 2014) ..........................................................................................12

*Liebowitz v. Bandshell Artist Mgmt.*,
 6 F.4th 267 (2d Cir. 2021) .................................................................................................12

*Lipton v. Nature Co.*,
 71 F.3d 464 (2d Cir. 1995)...........................................................................................15, 16

*Litchfield v. Spielberg*,
 736 F.2d 1352 (9th Cir. 1984) ..............................................................................................3

*Marcus v. ABC Signature Studios, Inc.*,
 279 F. Supp. 3d 1056 (C.D. Cal. 2017) ...............................................................................23

*Mayers v. Racino*,
 No. 23-CV-5183 (MKV), 2024 WL 3729020 (S.D.N.Y. Aug. 7, 2024)................................13

183190434

*Mowry v. Viacom Int'l, Inc.*,
No. 03 Civ. 3090 (AJP), 2005 WL 1793773 (S.D.N.Y. July 29, 2005) ...................................13

*Peter F. Gaito Arch., LLC v. Simone Dev't Corp.*,
602 F.3d 57 (2d Cir. 2010)...................................................................................................12

*Piuggi v. Good for You Prods. LLC*,
739 F. Supp. 3d 143 (S.D.N.Y. 2024)...................................................................................12

*Poindexter v. EMI Rec. Grp. Inc.*,
No. 11 CIV. 559 LTS JLC, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012)............................11

*Reyher v. Children's Television Workshop*,
533 F.2d 87 (2d Cir. 1976)...................................................................................................24

*Sheldon Abend Revocable Tr. v. Spielberg*,
748 F. Supp. 2d 200 (S.D.N.Y. 2010)..............................................................................20, 23

*Shull v. TBTF Prods., Inc.*,
No. 20-3529, 2021 WL 3027181 (2d Cir. July 19, 2021).......................................................12

*Silberstein v. Fox Ent. Grp., Inc.*,
424 F. Supp. 2d 616 (S.D.N.Y. 2004)...................................................................................13

*Sinicola v. Warner Bros.*,
948 F. Supp. 1176 (E.D.N.Y. 1996) .....................................................................................23

*Tomasini v. Walt Disney Co.*,
84 F. Supp. 2d 516 (S.D.N.Y. 2000)......................................................................................13

*Wager v. Littell*,
549 F. App'x 32 (2d Cir. 2014) ...................................................................................13, 14, 15

*Walker v. Time Life Films, Inc.*,
784 F.2d 44 (2d Cir. 1986)........................................................................................17, 18, 26

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996)............................................................................................. *passim*

**Statutes**

17 U.S.C. § 102...................................................................................................................17

17 U.S.C. § 411...................................................................................................................12

**Other Authorities**

Fed. R. Civ. P. 12 ....................................................................................................... *passim*

183190434

Thomas E. Simmons, *What Zombies Can Teach Law Students: Popular Text
    Inclusion in Law and Literature*, Law and Literature,
    66 MERCER L. REV. 729, (2015) ........................................................................1, 6, 7

183190434

Defendants James R. Jarmusch ("Jarmusch") and Focus Features LLC ("Focus") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the "corrected" Third Amended Complaint ("TAC") (Dkt. 49) filed by plaintiff Trevor Dellno Keeth ("Plaintiff") pursuant to Fed. R. Civ. P. Rule 12(b)(6) and the Court's March 11, 2026 Order (Dkt. 47). The TAC should be dismissed with prejudice because it fails to state a viable claim.

## I.    PRELIMINARY STATEMENT

Humans battling the undead in a zombie apocalypse is a familiar concept in film.[1] One might even say the genre has been "done to death." Zombie films routinely draw on common ideas, stock tropes, and scènes à faire that have long served as fertile ground for both horror and humor.

Against this backdrop, Plaintiff's TAC alleges that Defendants' 2019 satiric zombie film, *The Dead Don't Die* ("TDDD" or "Defendants' Work"), unlawfully copied Plaintiff's unproduced screenplay entitled, *Dead* ("DEAD" or "Plaintiff's Work"). Plaintiff's theory of infringement entirely rests on purported similarities of unprotected concepts and ideas at a high degree of abstraction, including that both works feature zombies exhibiting vestigial memories of their former lives and share a character named "Hank." However, a comparison of the two works at the required level of original protectable expression confirms they share no similarities capable of supporting a copyright infringement claim. TDDD is a dry, deadpan zombie satire set in the small town of Centerville, in which environmental disruption caused by "polar fracking" has sent our society of narcissistic consumerism off balance. Daylight stretches unnaturally long, electronic

---

[1] Zombies are now so firmly rooted in popular culture that they have become a subject of serious legal scholarship. *See* Thomas E. Simmons, *What Zombies Can Teach Law Students: Popular Text Inclusion in Law and Literature*, 66 MERCER L. REV. 729, 735 (2015) (henceforth, "Simmons") ("[Z]ombies are re-animated corpses hungering for human flesh, which transform their victims into zombies. An infected individual typically becomes a zombie by one of two paths: dying from zombie-inflicted wounds and then re-animating post-mortem, or suffering a non-lethal zombie infection (for example, from a superficial bite) and transforming into a zombie.").

devices malfunction, and the dead begin to rise. The story follows Police Chief Cliff Robertson and Officer Ronnie Peterson as a handful of bizarre deaths escalate into systemic collapse. Zombies drift through town murmuring for coffee, candy, and prescription drugs, while the living respond with weary detachment and gallows humor. The film repeatedly breaks the fourth wall, openly acknowledging its own construction and foretelling its bleak outcome. It ends not with survival, but with the town overrun, most of the protagonists consumed, and the apocalypse reduced to a nihilistic reflection on a society undone by its own compulsions.

DEAD, by contrast, is set in the New England town of Peterborough, where the undead have long been confined in a pit beneath the local church. When that safeguard fails and the zombies escape, a small group is forced to confront a ravenous zombie rabble. At the center of the story are Duckie McGuinness, a disgraced former boxer seeking redemption, and Father Kyle Brady, a young idealistic priest. The story builds toward a final confrontation at the church, as the town restores order. In the end, Duckie remains in Peterborough to assume clerical duties – including supervision of the zombie pit – while Captain Kephart, the former commander of the Sheriff's Department who is now a zombie himself, rides off to continue fighting the undead.

Plaintiff's infringement claim fails for at least two reasons:

First, Plaintiff's allegations of Defendants' access to DEAD are facially insufficient. The TAC relies primarily on the assertion that Plaintiff submitted his screenplay to a film festival that Jarmusch allegedly attended to premiere one of his own films. Critically, Plaintiff does not allege that Jarmusch read, judged, or otherwise encountered Plaintiff's submission, nor that DEAD was ever seen by anyone else involved in creating TDDD or the film's distributor, Focus.

Second, the two works share nothing beyond unprotectable ideas and genre conventions inherent in smalltown zombie comedies. Copyright only protects original expressive elements and

2

183190434

not ideas; Plaintiff does not have a monopoly on the concept of zombies with vestigial memories or the use of the name "Hank." The alleged similarities exist only at the highest level of abstraction and consist entirely of stock elements not entitled to copyright protection. No reasonable observer could conclude that the works are substantially similar in their original protectable expression. Rather, "[a]s is too often the case, [this] action [is] premised 'partly upon a wholly erroneous understanding of the extent of copyright protection; and partly upon that obsessive conviction, so common among authors, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism.'" *Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir. 1984) (quoting *Dellar v. Samuel Goldwyn*, 150 F.2d 612, 613 (2d Cir. 1945)).

Plaintiff has already pled his claims five times, but none of these iterations have reanimated his moribund grounds for relief. Because no further amendment can breathe life into Plaintiff's infringement claim, the TAC should be dismissed with prejudice and finally laid to rest.

## II.    BACKGROUND

### A.    PROCEDURAL HISTORY

Plaintiff filed this action on August 28, 2025, alleging that Jarmusch infringed Plaintiff's 2003 registered screenplay DEAD by creating and distributing TDDD. Dkt. 1. Plaintiff attached several exhibits to the original Complaint, including an assessment by Kathryn Reiss, an Associate Teaching Professor at Mills College, who observed "the two storylines do not unfold in the same way" and "are not telling the same story." Dkt. 1-3 at p.2. She was right.

Nonetheless, on October 21, 2025, Plaintiff filed a First Amended Complaint adding TDDD's distributor, Focus, and Animal Kingdom LLC as defendants. Dkt. 14. On November 24, 2025, without leave of Court, Plaintiff filed a Second Amended Complaint removing Animal Kingdom LLC, thus narrowing the defendants to Jarmusch and Focus. Dkt. 18.

On March 11, 2026, the Court set a briefing schedule for Defendants' anticipated motion

3

to dismiss and granted Plaintiff leave to amend. Dkt. 47. Plaintiff then filed a Third Amended Complaint on March 16, 2026 (Dkt. 48), which was immediately followed by a "Corrected" Third Amended Complaint filed on March 17, 2026 (henceforth, the "TAC") (Dkt. 49).

The TAC, like Plaintiff's four prior complaints, asserts a single claim for copyright infringement and references Exhibits "A" through "E," although none were re-filed. *See* Dkts. 1-1 – 1-6.  The TAC fails to state plausible claims for relief and should be dismissed.

**B.    ALLEGATIONS OF THE TAC**

Plaintiff alleges he registered with the U.S. Copyright Office under Registration No. PAU002779531 a 2003 draft of DEAD. TAC ¶ 1.  Plaintiff further avers he authored a revised version of DEAD in 2016, retaining the core plot and structure, and that TDDD supposedly incorporates material from both the 2003 deposit copy and elements present only in the unregistered 2016 revision. *Id*. ¶ 2.  The TAC pleads that DEAD received "positive festival placements" in 2003 at unnamed festivals, resulting in "industry circulation" and that, after revising the work in 2016, Plaintiff re-submitted his screenplay to other festivals, including the 2016 Austin Film Festival, where it advanced past the first two rounds of judges and received a critique from an unnamed "industry insider."  *Id*. ¶ 3. Plaintiff further alleges that at that same festival, Jarmusch premiered an unidentified film.  *Id*.  Plaintiff avers his screenplay was also submitted to The Black List, which he claims is an industry database of screenplays for producers and directors. *Id*. From these submissions, Plaintiff contends that Defendants supposedly had a reasonable opportunity to view and read Plaintiff's Work. *Id*.

Plaintiff further alleges the TDDD is substantially similar to DEAD based on overlapping elements of characters, settings, imagery, and plot. *Id*. ¶ 4.  He contends that both works feature comparable small-town law enforcement characters, including a sheriff, deputies, a character named Hank, as well as similar locations such as woods, a diner, a police station, and a gas station.

183190434

Plaintiff further claims similarities in the depiction of newly risen zombies wearing distinctive clothing, the way police characters are introduced through descriptions of uniforms and weapons, and certain scenes reflecting the undead's refusal to remain dead. *Id.* Plaintiff also claims that TDDD combines or mirrors several character concepts from DEAD, including a non-human medical professional with a secret room who escapes at the end while wielding a samurai sword, a zombie town drunk sleeping in a jail cell, and secondary characters identified by plaid clothing or name-tagged uniforms. Finally, Plaintiff avers both works share similar sequences of events, including comedic diner scenes involving zombies, police besieged by the undead, and a climactic confrontation in a hallowed space in which characters are overwhelmed by swarming zombies. *Id.*

## C.    THE WORKS AT ISSUE

### 1.    Summary of Defendants' Work

TDDD is set in the fictional small town of Centerville. The film opens with Police Chief Cliff Robertson ("Chief Robertson") and Officer Ronnie Peterson ("Officer Peterson") discovering Hermit Bob's campsite in the woods. They notice that daylight is lasting far longer than normal and that electronic devices are malfunctioning, signaling something is profoundly wrong. Police Chief Robertson and Officer Peterson drive through Centerville, establishing key landmarks, including a motel, a juvenile detention center, a gas station, a hardware store, a diner, and a funeral home. As they drive, they listen to the song "The Dead Don't Die" by Sturgill Simpson. In the first of many fourth-wall-breaking moments, Officer Peterson acknowledges that the song is the film's "theme song." *See* Ex. A at 00:00:00 - 00:10:05.

At the Terminal Diner, Fern, one of the waitresses, refills coffee cups while Hank Thompson ("Hank") engages in an awkward and strained conversation with Farmer Frank Miller, an openly racist character who wears a red baseball cap bearing the slogan "Keep America White

5

Again." Televised news reports in the diner attribute the strange daylight patterns to "polar fracking" that may have shifted the Earth's axis. *Id*. at 00:10:06 - 00:12:35.

Elsewhere, at the juvenile detention center, teenagers Geronimo, Stella, and Olivia discuss the possibility of an impending catastrophe. Animals and insects begin behaving erratically, including Farmer Miller's dog and cows, which run away. Chief Robertson retains the corpse of the former town drunk, Mallory O'Brien, in a jail cell because both slabs at the funeral parlor are occupied. Officer Peterson repeatedly warns that events will end badly. *Id*. at 00:12:36 - 00:22:26.

At the Ever After Funeral Home, the mysterious Zelda Winston ("Zelda"), a tall, striking Scottish Buddhist undertaker, trains with a samurai sword. She soon notices troubling movements from two corpses under her care. That same night, two dead bodies rise from the cemetery as the full moon is enveloped in a strange purple glow. The two zombies attack and kill Fern and Lily, the diner's waitresses, then drink coffee as if their caffeine addiction survived their undeath. Police Chief Robertson, Officer Peterson, and Officer Mindy Morrison ("Officer Mindy"), the town's only three police officers, investigate. Officer Peterson arrives in a comically small patrol car, and Officer Mindy struggles to maintain her composure while Officer Peterson matter-of-factly suggests zombies are responsible. *Id*. at 00:22:27 - 00:37:53.

Three hipsters drive into Centerville to refuel their 1968 Pontiac LeMans. At the gas station, clerk Bobby Wiggins ("Bobby"), a science fiction enthusiast, discusses the news reports with them and describes their car as "very George Romero," to which one hipster acknowledges it is "a classic."[2]  Chief Robertson and Officer Peterson later visit the cemetery, where they discuss

---

[2]  This is a reference to George Romero's 1968 classic zombie film, *Night of the Living Dead*, which is said to have started the modern zombie movie trend. *See* Simmons, *supra*, fn. 1, at 735.

6

methods for killing zombies. At the same time, Bobby and Hank arms themselves at the hardware store, as Bobby explains the essential zombie rule: "Kill the head."[3] *Id*. at 00:37:54 - 00:55:58.

The zombie threat rapidly escalates as more undead emerge. The motel owner is killed by a zombified guest muttering "free cable." Police Chief Robertson, Officer Peterson, and Officer Mindy arm themselves at the police station and decapitate the reanimated corpse of Mallory O'Brien, whose only utterance is "Chardonnay." Farmer Miller shoots a zombie entering his home. Zombified children wander through a store seeking candy and toys, while adult zombies call out for prescription drugs and "Wi-Fi" outside a pharmacy. Bobby and Hank battle zombies at the hardware store, and Geronimo, Stella, and Olivia barricade themselves inside the detention center. *Id*. at 00:55:59 - 01:06:37.

Officer Peterson continues repeating his bleak warnings. Zelda emerges as a highly effective zombie slayer, decapitating the undead with her samurai sword before arriving at the police station. Farmer Miller continues fighting zombies inside his home. Chief Robertson, Officer Peterson, and Officer Mindy discover the dead bodies of the traveling hipsters in a motel room. Bobby and Hank are overrun and killed at the hardware store. Geronimo, Stella, and Olivia escape Centerville. *Id*. at 01:06:38 - 01:23:00.

Hermit Bob observes the chaos from a distance while eating Farmer Miller's chicken as Farmer Miller succumbs to the zombies. Officer Mindy recognizes her zombified grandmother among the horde and joins her in a moment of despair. Chief Robertson confronts Officer Peterson about his unnervingly calm demeanor and persistent certainty that events will end badly. In a meta-fictional scene, Officer Peterson reveals that he has "read the script" and knows the outcome. Chief Robertson complains that the director, "Jim" [Jarmusch], only gave him partial scenes. Zelda is

---

[3] It is a well-known part of zombie lore that "[t]he only way a zombie can be de-animated is by a traumatic blow to the head." Simmons, *supra*, fn. 1, at 735.

7

then revealed to be an alien when a flying saucer descends to whisk her away. Chief Robertson and Officer Peterson note that the spacecraft was not included in the script they read. *Id*. at 01:23:01 - 01:33:15.

The two officers make a final stand in the cemetery against an overwhelming pack of zombies, including zombified versions of Farmer Miller, Hank, Bobby, and Officer Mindy. They are ultimately killed. Hermit Bob watches from afar and delivers the film's closing commentary:

> Zombies: remnants of the material people. I guess they've been zombies all along. Ghosts.…The dead just don't want to die today… The end of the world. I guess all them ghost people plumb lost their goddamn souls. Must have traded 'em away or sold 'em for gold or whatnot. New trucks, kitchen appliances, new trousers, Nintendo Game Boys, sh*t like that. Just hungry for more stuff. Down they go; the sad end of Cliff and Ronnie. What a f*cked-up world.

*Id*. at 01:33:16 - 01:39:00.   This bleak soliloquy epitomizes the film's overarching cautionary theme that environmental neglect and narcissistic consumerism are destroying our world.

### 2.    Summary of Plaintiff's Work

DEAD is set in the small New England town of Peterborough. It opens in a church cellar, where farmers Hank and Earl deliver a cow to Father Dan, who feeds it to creatures trapped in an enormous pit beneath the church. As Father Dan reseals the pit's grate, he suffers a fatal heart attack. Rotting hands drag his body into the abyss, and zombies begin crawling out. Ex. B at 1-3. Father Kyle Brady ("Father Brady"), a leather-clad, motorcycle-riding Catholic priest, heads toward Peterborough and picks up hitchhiker Duckie McGuinness ("Duckie"), a former professional boxer known as "Mad Duck." At the Harper home, Harriette Harper discovers her husband has returned as a zombie. The Sheriff orders Deputy Dwayne Dawg ("Dwayne") to "call the boys" because they have "one walking." Wearing black padded leather armor, the standard gear of Peterborough's established "Zombie Squad," the Sheriff, Dwayne, Hank, and Earl subdue Harper with cattle prods and a straitjacket. *Id*. at 4-11.

8

183190434

Father Brady and Duckie arrive as the screaming Harper family runs toward the local diner. Doctor David Diedrich ("Doc Diedrich"), conspicuous for his facial makeup, tends to them. Inside the diner, Duckie notices boxing gloves honoring local prizefighter. Later, townspeople beat Duckie for allegedly throwing his last fight, and Dwayne arrests him for disturbing the peace. In his cell, Duckie confesses that he knew his opponent had died the instant he landed the fatal punch. *Id*. at 12-28. While driving toward the church, the Sheriff reveals Peterborough's secret to Father Brady: some townspeople do not stay dead. For years, the town has maintained a pit beneath the church, tended by the priest, to contain the undead. At the church, zombies have overrun the grounds. The Sheriff and Father Brady flee and narrowly escape by climbing a tree. *Id*. at 16-35.

Back in town, zombies enter the diner. Dierdre, the waitress, and the cook serve raw meat to zombie customers, who spit out cooked food in disgust. A zombie puts a quarter in the jukebox and "Staying Alive" plays; annoyed, the zombie kicks the machine. Outside, zombies compulsively reenact their former lives. The zombie Mayor waves while parading down Main Street, a zombie bluegrass band plays on a corner, and a zombie crossing guard directs traffic. *Id*. at 29-39. After Dwayne rescues the Sheriff and Father Brady, the group frees Duckie. Dierdre explains that rather than destroy the undead, the townspeople chose to contain them because these were friends, neighbors, and loved ones. Doc Diedrich reveals he has a serum that can prevent the bitten from turning to zombies, and the group rushes Dierdre, who has been bitten at the ankle, to his medical office. *Id*. at 35-49.

At the Medical Center, they find zombies playing bingo. While Doc Diedrich treats Dierdre, Duckie discovers Doc Diedrich's hidden laboratory, complete with severed body parts, electrodes, and dated serum bottles, along with photographs revealing that he has long been a zombie, using the serum and makeup to conceal it. Doc Diedrich's true nature manifests when he

183190434

attacks Dierdre, biting a chunk of flesh from her thigh before partially regaining his senses, pulling off his own scalp, and fleeing in horror. The group flees the Medical Center through a hallway packed with bingo-playing zombies, the Sheriff blasting them with his shotgun. *Id*. at 50-57.

Zombie Captain Kephart, the Sheriff's former boss who died ten years earlier and now is a zombie himself (while remaining fully committed to his former job in law enforcement), emerges wearing Zombie Squad armor, and fends off the zombies. At a roadblock, Dwayne, Earl, and Paul battle a massive zombie assault and are all killed. In an alley, Duckie confronts a zombified former boxing opponent in an extended boxing match staged as a makeshift zombie ring with a Zombie Referee. Duckie decapitates the boxer with a vicious punch, challenges the horde to fight, and is ultimately buried beneath a mass of zombies. *Id*. at 60-96.

The Sheriff and Father Brady lure the zombies back to the church by exploiting their compulsive routines. Using Father Dan's wristwatch alarm to trigger the church bells, they simulate a Sunday call to worship. The zombies begin a pilgrimage to the church. Inside, Father Brady performs a grim parody of communion, offering wine with one hand and a revolver with the other, saying, "The blood of Christ" before executing each zombie. Zombie Doc Diedrich and Zombie Dierdre approach hand in hand, seeking marriage. Duckie marries them and then shoots them both. Succumbing to a bite, Father Brady asks the Sheriff to kill him, and the church erupts in flames. *Id*. at 84-101.

In the aftermath, Duckie declares he has "got [his] quack back" and offers to remain in Peterborough as its new priest. Captain Kephart rides off on Father Brady's motorcycle, waving goodbye. The story ends with intimations of a sequel, as apparently not all the remaining zombies were executed at the church; instead, the ending has Zombie Harper seated alone at his family's dining table, silent and still, until his stomach emits a loud, gurgling growl. *Id*. at 101-102.

10

183190434

### III.    LEGAL STANDARD

Under Fed. R. Civ. P. Rule 12(b)(6), a plaintiff's complaint must allege "sufficient factual matter" to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.; Twombly*, 550 U.S. at 555. Allegations showing a "mere possibility of misconduct" are insufficient. *Iqbal*, 556 U.S. at 679. Plausibility depends on whether "the pleaded factual content allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. A plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level. *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011).

"Where, as here, the disputed works in a copyright action are attached to or incorporated by reference in the complaint, a district court can 'consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation.'" *Greene v. Warner Music Grp*., No. 23 CIV. 1555 (KPF), 2024 WL 3045966, at *4 (S.D.N.Y. June 18, 2024) (quoting *Peter F. Gaito Arch., LLC v. Simone Dev't Corp*., 602 F.3d 57, 64 (2d Cir. 2010). Importantly, allegations that are contradicted by a document incorporated by reference are not entitled to a presumption of truth. *Poindexter v. EMI Rec. Grp. Inc*., No. 11 CIV. 559 LTS JLC, 2012 WL 1027639, at *6 (S.D.N.Y. Mar. 27, 2012). Accordingly, in connection with this Motion, Defendants have submitted Plaintiff's 2003 screenplay, DEAD, which Plaintiff previously filed with his Complaint (Dkt. 1-5), and a DVD copy of TDDD, which Plaintiff alleges infringes his copyright and is thus incorporated by reference into the TAC. *See* Declaration of David Aronoff ¶¶ 2-3; Exs. A & B.

11

If after reviewing the two works, the Court finds that no protectable elements have been copied, or that any protected elements are not sufficiently similar, it may dismiss the TAC with prejudice. *Greene*, 2024 WL 3045966, at *14 (granting motion to dismiss with prejudice); *Shull v. TBTF Prods., Inc.*, No. 20-3529, 2021 WL 3027181, at *3 (2d Cir. July 19, 2021) (district court "properly dismissed the copyright infringement claims here on the ground that the works at issue are not substantially similar, dooming these claims as a matter of law."); *Klauber Bros. v. Bon-Ton Stores, Inc.*, 557 F. App'x 77, 80 (2d Cir. 2014) (it is "entirely appropriate" to grant a motion to dismiss "if no reasonable jury, properly instructed, could find that the two works are substantially similar") (quoting *Peter F. Gaito Arch., LLC*, 602 F.3d at 63).

## IV.    ARGUMENT

A plaintiff asserting a copyright infringement claim must plead two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Piuggi v. Good for You Prods. LLC*, 739 F. Supp. 3d 143, 156 (S.D.N.Y. 2024). To satisfy the first element, the plaintiff must have registered his work with the U.S. Copyright Office. *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 299 (2019); 17 U.S.C. § 411(a). To satisfy the second element, the plaintiff must establish that: (a) the defendant "actually copied" the plaintiff's work, and (b) "a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito Architecture, LLC*, 602 F.3d at 63 (cleaned up); *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020).

Here, the TAC alleges only a copyright registration for Plaintiff's 2003 draft of DEAD. Dkt. 1-5. Because Plaintiff does not allege that he registered his 2016 draft, any infringement claim based on material present only in that unregistered draft must be dismissed. *See, e.g.*, *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 273 n.4 (2d Cir. 2021) ("a suit filed pre-registration is fatally flawed and cannot be cured by a subsequent registration and amendment of the complaint");

12

*Mayers v. Racino*, No. 23-CV-5183 (MKV), 2024 WL 3729020, at *4 (S.D.N.Y. Aug. 7, 2024) ("[b]ecause Plaintiff concedes that he did not 'apply for registration and/or receive the Copyright Office's decision on [his] application before instituting suit,'… his copyright infringement claim must be dismissed ***with*** prejudice.") (emphasis in original).

Moreover, as addressed below, the TAC fails as a matter of law because it does not plausibly allege actual copying or substantial similarity between TDDD and any draft of DEAD.

## A.    THE TAC FAILS TO PLAUSIBLY ALLEGE COPYING

### 1.    The TAC Fails to Plausibly Allege Access

Because copyright infringement requires actual copying, a plaintiff must allege that the accused infringer had a reasonable opportunity – not merely a bare possibility – to view the plaintiff's work. *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003); *Silberstein v. Fox Ent. Grp., Inc.*, 424 F. Supp. 2d 616, 624 (S.D.N.Y. 2004), *aff'd*, 242 F. App'x 720 (2d Cir. 2007). Access "may not be inferred through speculation or conjecture." *Jorgensen*, 351 F.3d at 51. When access is alleged through a third-party, as here, the intermediary who allegedly supplied the plaintiff's work to the defendant must have had "a close relationship" with the defendant. *Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*, No. 16-CV-9987 (PKC), 2019 WL 1382341, at *6 (S.D.N.Y. Mar. 27, 2019) (citing *Jorgensen*, 351 F.3d at 53). Further, the plaintiff must allege a "chain of events" establishing an unbroken link between the plaintiff's work and the defendants. *See Mowry v. Viacom Int'l, Inc.*, No. 03 Civ. 3090 (AJP), 2005 WL 1793773, at *5 (S.D.N.Y. July 29, 2005); *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 522 (S.D.N.Y. 2000); *Wager v. Littell*, 549 F. App'x 32, 33 (2d Cir. 2014).

*Hord v. Jackson* is instructive. 281 F. Supp. 3d 417 (S.D.N.Y. 2017) (granting motion to dismiss). There, the plaintiffs alleged that they sent their screenplay to two non-party television executives who later supposedly met with one of the defendants to pitch the plaintiffs' screenplay.

13

183190434

*Id*. at 419, 423. The plaintiffs identified the executives by name and "on information and belief" claimed a specific meeting date near the creation of the defendants' accused series. *Id*. The court dismissed the claim because the plaintiffs' "naked assertions . . . that two non-parties allegedly showed the work to Defendants" were insufficient given that the allegations lacked any factual support and instead consisted of bare conclusions. *Id*. at 423.

Here, likewise, the TAC falls far short of alleging access. Plaintiff claims: (1) that he submitted DEAD to an unnamed film festival in 2003 where it allegedly received "positive" placements; (2) that he submitted a revised draft to the 2016 Austin Film Festival while Jarmusch was premiering an unrelated film; and (3) that he uploaded DEAD to an online database. TAC ¶ 3. These conclusory allegations are insufficient to plausibly allege access because they do not contain specific facts from which the Court can infer that Defendants had a reasonable opportunity to read and copy Plaintiff's Work. *See Klauber Bros., Inc. v. URBN US Retail LLC*, No. 1:21-CV-4526-GHW, 2023 WL 1818472, at *5 (S.D.N.Y. Feb. 8, 2023) (requiring "specific facts from which the Court can infer access."). None of Plaintiff's allegations plausibly allege access; they are "nothing more than a generic list of means by which any infringer might gain access to" his screenplay, which is insufficient. *Id.* at *6.

Specifically, Plaintiff does not identify the 2003 festival, any individual who reviewed his submission, or any connection between those individuals and Jarmusch or Focus. Plaintiff does not allege that Jarmusch served as a reader, judge, or recipient of any festival submissions, let alone that Jarmusch encountered Plaintiff's Work.[4] Focus is not alleged to have had any nexus

---

[4] Notably, "9,100 individual scripts" were submitted to the 2016 Austin Film Festival screenplay competition and Plaintiff's Work did not advance to the "Second Rounders," semifinalists, or finalists. *See 2016 SF & 2Rounders*, AFF BLOG, (Sept. 13, 2016), *available at*, https://austinfilmfestival.com/blog/2016-sf-2rounders/   (tellingly, the titles of submitted scripts included: *Zombies Anonymous, Robot Zombies*, *iZombie*, *Meth Zombie*, *Night of the Liberal Dead*, and *Undead Outlaws*); *2016 Screenplay Competition Finalists Announced,* AFF BLOG, (Oct. 5, 2016), *available at* https://austinfilmfestival.com/blog/2016-screenplay-competition-finalists-announced/ (noting that the script *Zombie's Anonymous* by Michael A. Wright was a finalist for Screenplay-Comedy category).

183190434

with DEAD at all. Moreover, "the mere fact that [Plaintiff's] work was posted on the internet prior to the creation of defendants' work is insufficient by itself to demonstrate wide dissemination" necessary to infer access. *Clanton v. UMG Recordings, Inc.*, 556 F. Supp. 3d 322, 328 (S.D.N.Y. 2021). Courts routinely reject access allegations far more concrete than those here. *See, e.g., Wager*, 549 F. App'x at 33 (affirming dismissal for lack of alleged access where plaintiff claimed that a manuscript was loaned to third parties who supposedly showed the manuscript to defendant); *Castro v. Cusack*, No. 15CV6714ENVLB, 2019 WL 3385218, at *7 (E.D.N.Y. July 26, 2019) (allegation that the plaintiff's script was sent to defendant's agent is insufficient); *see also Jones v. Atl. Recs.*, No. 22-CV-893 (ALC), 2023 WL 5577282, at *4 (S.D.N.Y. Aug. 29, 2023) (allegations of access via third-parties held insufficient), *aff'd sub nom. Jones v. Atl. Recording Corp.*, No. 23-1348, 2025 WL 1872808 (2d Cir. July 8, 2025).

Put simply, submitting DEAD to festivals and an online platform, without specific factual allegations plausibly linking the script to either of Defendants, amounts to conjecture insufficient to support a claim that Defendants had a reasonable opportunity to read and copy Plaintiff's Work.

### 2. The TAC Does Not Allege Striking Similarity Nor Could It

The TAC neither alleges nor could it establish "striking similarity" to support an inference of copying. *Jorgensen*, 351 F.3d at 56; *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995). Striking similarity requires that the "works in question are 'so strikingly similar as to preclude the possibility of independent creation.'" *Lipton*, 71 F.3d at 471 (quoting *Ferguson v. NBC, Inc.*, 584 F.2d 111, 113 (5th Cir. 1978)). Plaintiff's conclusory allegation of "near verbatim copying" (TAC ¶ 4) is implausible and insufficient because it is belied by the actual works.

Plaintiff compares the lines: "Some folks around here just don't like to stay dead is all" (DEAD) and "So, the dead just don't want to die today" (TDDD). TAC ¶ 4 at 3. But the observation that the dead are reluctant to remain dead is the very premise of the zombie genre, and

15

these two sentences convey that commonplace idea differently.

Similarly, Plaintiff compares the introduction of law enforcement characters via their clothing, noting both works describe officers in uniform carrying shotguns. *Id*. But the description of small-town officers in uniform with shotguns is generic and could appear in any story involving rural law enforcement. The specific descriptions are quite different: DEAD describes officers in "identical, black, padded leather armor" of a "Zombie Squad," each carrying "a small, sawed-off shotgun," while TDDD describes officers in "khaki uniforms of small-town police officers" wearing "retro-looking eyeglasses with thick dark frames," with one cradling "a pump-action 12-gauge shotgun." *Id*.  These are divergent descriptions of different and distinguishable characters.

Plaintiff's remaining "verbatim" comparisons suffer from the same deficiency. The alleged parallels – zombies returning from the grave, a small-town drunk becoming a zombie, use of a sword to decapitate zombies, the name Hank for different characters, a farmer in a flannel shirt, zombies interacting with food in a diner, and characters disappearing under piles of zombies (TAC ¶ 4 at 3-5) – are not "so nearly alike that the only reasonable explanation for such a great degree of similarity is that the later ... was copied from the first." *Cox v. Abrams*, No. 93 CIV. 6899 (RJW), 1997 WL 251532, at *5 (S.D.N.Y. May 14, 1997) (cleaned up).

In short, the purported "striking similarities" consist of general ideas endemic to the zombie genre, including stock ideas, generic motifs, and scènes à faire that utterly fail "to preclude the possibility of independent creation." *Lipton*, 71 F.3d at 471.

## B.    SUBSTANTIAL SIMILARITY IS NOT PLAUSIBLY ALLEGED

Copyright protects only elements that are original to the author. *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996); *Boisson v. Banian, Ltd*., 273 F.3d 262, 268 (2d Cir. 2001). Where the plaintiff's work is wholly original, courts apply the "ordinary observer" test. *Boisson*, 273 F.3d at 271-72. The Court must determine "whether an ordinary observer, unless he set out to detect the

16

disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *See Edwards v. Raymond*, 22 F. Supp. 3d 293, 297-98 (S.D.N.Y. 2014) (quoting *Peter F. Gaito Architecture, LLC*, 602 F.3d at 66). Where, as here, a work incorporates unprotectable elements from the public domain – such as zombies – courts apply the "more discerning observer" test, which requires "substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed [work]." *Boisson*, 273 F.3d at 272 (cleaned up).

In making this determination, the Court "examine[s] the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Williams*, 84 F.3d at 588; *Abdin v. CBS Broad. Inc*., 971 F.3d 57, 66 (2d Cir. 2020). The Court must disregard alleged similarities in unprotected elements – such as "scènes à faire" (scenes that necessarily result from the choice of a setting or situation), ideas (which are expressly excluded from copyright protection, 17 U.S.C. § 102(b)), and stock elements linked to a particular genre. *Walker v. Time Life Films, Inc*., 784 F.2d 44, 48-51 (2d Cir. 1986). The Court "must attempt to extract the unprotectible elements from [its] consideration and ask whether the protectible elements, standing alone, are substantially similar." *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 291 (S.D.N.Y. 2012) (granting Rule 12(c) motion because no substantial similarity existed).

Thus, it has been held Rule 12(b)(6) dismissal is proper when allegations of infringement "are driven by the wholly *unprotectable* concept of humans battling zombies in a mall during a zombie outbreak." *Capcom Co., Ltd. v. MKR Group, Inc*., No. 08-0904 RS, 2008 WL 4661479, *7 (N.D. Cal. Oct. 20, 2008) (emphasis in original) (holding as a matter of law the zombie videogame *Dead Rising* did not infringe the zombie film *Dawn of the Dead*). Applying these principles to the works at issue here, Plaintiff's claim of substantial similarity is deficient.

183190434

### 1.    The "Total Concept and Feel" of the Two Works Is Entirely Different

"The distinction between an idea and its expression is an elusive one." *Williams*, 84 F.3d at 587-88. The gist "is that an author must use creativity to transform facts and ideas into an expression that displays the stamp of the author's originality." *Hudson v. Universal Studios, Inc.*, No. 04 CIV 6997(GEL), 2008 WL 4701488, at *2 (S.D.N.Y. Oct. 23, 2008), *aff'd*, 369 F. App'x 291 (2d Cir. 2010) (cleaned up). "If the similarity between two works rests solely on a shared underlying idea, rather than the particular way in which that idea has been portrayed, there is no 'substantial similarity.'" *Id*.

For example, in *Williams v. Crichton*, the Second Circuit held as a matter of law that no substantial similarity existed between *Dinosaur World* and *Jurassic Park*, even though both involved a dinosaur zoo, a small group of visitors including children, and dangerous encounters with carnivorous dinosaurs. 84 F.3d at 589. The Court explained that similarities at a high level of abstraction did not suffice because the works diverged in their expression, character development, and narrative execution. *Id*. at 590.  Because the works shared only unprotectable ideas, not protected expression, the court found no substantial similarity as a matter of law.

Similarly, here, although Plaintiff alleges that both works depict costumed zombies exhibiting remnants of their former lives, that concept is a foundational and unprotectable idea underlying the zombie genre. *See Capcom Co., Ltd.*, *supra*, 2008 WL 4661479 at *9 (noting that in *Dawn of the Dead* the zombies are "in a desperate search for the consumer goods that drove them while alive.").  In any event, such alleged similarities at the general level of abstract ideas cannot support a finding of substantial similarity. *Walker*, 784 F.2d at 48-49 ("copyright protection … extends only to [an author's] particular expression of ideas, not to the ideas themselves"). Likewise, as with nearly all stories set in small towns, both works include familiar genre elements such as local police officers, shotguns, diners, and convenience stores. But similarities drawn from

18

such stock ideas are legally irrelevant as "similarities in unprotectable elements … do not count toward a finding of substantial similarity." *Effie Film, LLC*, 909 F. Supp. 2d at 303.

Once those unprotectable conventions are set aside, the works are wholly dissimilar. TDDD is an intentionally bleak, self-aware satire using the zombie apocalypse as an allegory for the dangers of environmental disregard and unchecked consumerism. It has no romantic relationships, and the only characters to survive are already detached from society – Hermit Bob and the juvenile detainees. The film's humor is deadpan and metafictional; it repeatedly breaks the fourth wall and ends with the protagonists dying, society collapsing, and the undead reduced to compulsive echoes of their former addictions. DEAD, by contrast, is a traditional horror-comedy with a linear plot emphasizing community, redemption, and heroism, culminating in a hopeful resolution where the zombie uprising has been quelled. These diametrically opposed narrative aims confirm that the "total concept and feel" of the two works are fundamentally incompatible.

### 2. The Two Works Have Dramatically Divergent Themes

As addressed above, the thematic cores of the two works are wholly dissimilar. DEAD is, at its heart, a love story. Its central thesis, articulated by Dierdre, is that the zombies were once "friends, neighbors, loved ones," (Ex. B at 43) and that destroying them inflicts a second, unbearable loss on the community. DEAD asks whether love and human connection can persist beyond death, and answers in the affirmative: Doc Diedrich serenades Dierdre as a zombie, the two present themselves for a wedding at the altar, and even the fearsome zombie Captain Kephart acts as a protector of the living.

The theme of TDDD is entirely different. It is an explicit critique of consumerism and humanity's willful blindness towards the environmental destruction its capitalistic addictions cause. The cause of the zombie apocalypse is "polar fracking" which has thrown the Earth off its axis, and government spokesmen aggressively deny any connection. The zombies are drawn to the

consumer products they craved in life, mumbling "coffee," "Oxy[Contin]," "candy," "Wi-Fi," and "fashion" as they stumble through town. Hermit Bob delivers the film's thesis in his closing monologue: "I guess they've been zombies all along….people plumb lost their goddamn souls….Just hungry for more stuff." No such critique of consumerism exists anywhere in DEAD.

### 3.     The Characters in the Two Works Are Wholly Dissimilar

"The bar for substantial similarity in a character is set quite high." *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (hereinafter "*Sheldon*"). "In determining whether characters are similar, a court looks at the 'totality of [the characters'] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]." *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309-10 (S.D.N.Y. 1999) (cleaned up); *see also Hudson*, 2008 WL 4701488, at *6 (no copyright protection for "idea of a horny, sex-seeking, over-the-top, gay character," "tough prison guard," or "young, incarcerated African-American male"); *Allen v. Scholastic Inc*., 739 F. Supp. 2d 642, 659-60 (S.D.N.Y. 2011) ("famous male wizards, initiated late into wizarding (in pre/early adolescence), who receive formal education in wizarding and are chosen to compete in year-long wizard competitions" were unprotectable); *Sheldon*, 748 F. Supp. 2d at 208 (no substantial similarity although both works involved a "male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer"); *Arden v. Columbia Pictures Indus., Inc*., 908 F. Supp. 1248, 1261 (S.D.N.Y. 1995) (self-centered mid-thirty-something bachelors reliving the same day and pursuing love interest "exist[ed] only at a level of abstractions too basic to permit any inference that defendants wrongfully appropriated any 'expression' of plaintiff's ideas").

The TAC fails to allege any protectable similarity in character expression. Instead, it points only to the presence of sheriffs, deputies, and use of the character name "Hank." TAC ¶ 4. These

20

183190434

are stock elements of a small-town zombie narrative and unprotectable ideas. *Hudson*, 2008 WL 4701488, at *6. The works themselves, however, feature distinct characters and relationships.

DEAD is structured around characters with no analogues in TDDD. Its central figures are Father Brady, a motorcycle-riding priest newly assigned to Peterborough; Duckie, a hulking former boxer and drifter; and Doc Diedrich, a town physician who secretly turned into a zombie but conceals his condition with makeup. The narrative includes a substantial romantic subplot between Doc Diedrich and Dierdre, the diner waitress, whose relationship deepens even after she too has turned into a zombie. The supporting cast includes a gruff but sympathetic Sheriff, the antagonistic Dwayne, and Captain Kephart, an undead commander of the Sheriff's Department who functions as a protector wielding a samurai sword and shotgun.

TDDD, by contrast, is organized around an entirely different cast and expressive purpose. Its protagonists are Chief Robertson, an aging and weary small-town police chief, and Officer Peterson, a younger officer defined by emotional flatness and explicit meta-fictional awareness that he is following a script. A third officer, Officer Mindy, is an anxious figure whose arc ends in despair. The film also features Zelda, a Scottish funeral director and Buddhist ultimately revealed to be an alien; three hipster travelers; a horror-movie-obsessed gas station clerk; a racist farmer; three juvenile detainees; and Hermit Bob, a philosophizing recluse who narrates the film's moral commentary. None of these figures have any meaningful analogue in DEAD. TDDD contains no priest, no boxer protagonist, no secretly undead physician hiding his decay, and no central romantic couple. At most, both works depict residents or visitors of a small town during a zombie outbreak, a shared premise and genre convention that is not protectable. *See Williams*, 84 F.3d at 589 ("When one looks beyond the superficial similarities in the characters, many differences emerge, including

21

the motivations for the characters' trip to the dinosaur parks, the skills and credentials of the characters, and their interpersonal relationships.").

Courts routinely reject efforts to manufacture substantial similarity from stock roles and high-level character concepts. *Hogan* is instructive. 48 F. Supp. 2d at 310. There, both main characters were half-human, half-vampires named Nicholas Gaunt; both were young white males with pale skin, dark eyes, and scraggly hair; both sought to learn about their origins through flashbacks; and both faced the choice of pursuing good or evil. *Id*. The Court found no substantial similarity because the similarities were among "unprotectible ideas and themes that do not represent any original elements of plaintiffs' work." *Id*.

Here, each purported similarity collapses at the level of expressive detail. Plaintiff's attempt to equate Doc Diedrich and Captain Kephart (from DEAD) with Zelda (from TDDD) illustrates the flaw. Doc Diedrich is a zombie doctor masquerading as human embedded in a romantic arc; Captain Kephart is a separate undead police protector. Zelda is a singular alien mortician who wields a sword and exits in a spaceship. The only overlap is the abstract idea of a character with a concealed identity and a blade, which is an unprotectable idea.

Plaintiff's remaining comparisons fare no better, for example:

- Sheriff (DEAD) vs. Police Chief Robertson (TDDD): Both works include a senior law enforcement official, a stock idea inherent to small-town zombie stories. The similarities end there. Similar jobs do not establish similarity in expression. *Hudson*, 2008 WL 4701488, at *6.

- Deputy Dwayne (DEAD) vs. Officer Peterson (TDDD): Officer Peterson is defined by his meta-awareness and repeatedly bleak forecast because he has "read the script." Deputy Dwayne has no meta-fictional dimension and operates as a conventional supporting figure rooted

22

183190434

in physical conflict and sacrifice. Any overlap is limited to the unprotectable idea of a rural law enforcement officer. *Sheldon*, 748 F. Supp. 2d at 208; *Hogan*, 48 F. Supp. 2d at 312.

- Hank (DEAD) vs. Hank Thompson (TDDD). "Use of the same names does not sufficiently support infringement[.]" *Cavalier v. Random House, Inc.*, 297 F.3d 815, 828 (9th Cir. 2002) (citing *Hogan*, 48 F.Supp.2d at 311). Hank Thompson in TDDD is an African-American truck driver who underscores the racism of Farmer Frank Miller. Hank in DEAD is a farmer tied to the town's secret zombie containment system and the inciting events. The characters share no similarity in role, personality, or narrative function. The common name "Hank" for these otherwise divergent characters is insufficient to establish substantial similarity. *See*, *e.g.*, *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1069 (C.D. Cal. 2017); *CK Co. v. Burger King Corp.*, No. 92 CIV. 1488 (CSH), 1994 WL 533253, at *8 (S.D.N.Y. Sept. 30, 1994), *aff'd*, 122 F.3d 1055 (2d Cir. 1995); *Sinicola v. Warner Bros.*, 948 F. Supp. 1176, 1187 (E.D.N.Y. 1996); *Hogan*, 48 F.Supp.2d at 312.

Thus, Plaintiff fails to plausibly allege substantial similarity based on characters.

### 4.    Plot and Sequence of Events Are Not Substantially Similar

Plaintiff attempts to allege substantial similarity via a generalized sequence of zombie invasion, police response, sheltering, and a final confrontation at a church (DEAD) or cemetery (TDDD). At that level of abstraction, Plaintiff merely describes unprotected ideas. *See Capcom Co., Ltd., supra*, 2008 WL 4661479 at *7 ("the few similarities [plaintiff] has alleged are driven by the wholly *unprotectable* concept of humans battling zombies in a mall during a zombie outbreak") (emphasis in original); *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990) ("It has long been recognized that all fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other plots."); *Sheldon*, 748 F. Supp. 2d at 208 (no substantial similarity where "both works [told] the story of a male protagonist, confined to his

23

home, who spies on neighbors to stave off boredom, . . . discovers that one of his neighbors is a murderer, . . . is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated."); *see also Reyher v. Children's Television Workshop*, 533 F.2d 87, 89, 92 (2d Cir. 1976) (no substantial similarity despite "identical sequence of events" with both works describing a lost child who has difficulty finding his mother because his description of her as the most beautiful woman in the world does not match with the "homely woman" with whom he is ultimately reunited); *Allen*, 739 F. Supp. 2d at 645, 659-60 (dismissal of copyright claim alleging that HARRY POTTER infringed plaintiff's work involving a young male protagonist, secret wizarding communities, and wizard competitions).

The actual protectable expression in the works at issue is radically different. DEAD opens with a prologue revealing that Peterborough has long contained a zombie outbreak through a subterranean pit beneath its church, maintained by religious ritual. The crisis begins when Father Dan dies at the pit and the zombies escape. The story then follows the newly arrived priest, Father Brady, and Duckie, a former boxer-turned-drifter, as they confront the town's hidden history. Central plotlines include Doc Diedrich secretly hiding that he turned into a zombie, a sustained romantic subplot between Doc Diedrich and Dierdre, and a climax in which Father Brady orchestrates a plan to ring the church bells and lure the zombies inside for a mass execution. When Brady is bitten and must be killed, Duckie assumes a quasi-spiritual role as the town's protector.

TDDD contains none of these elements. There is no underground pit, no religious ritual, no doctor who is a zombie in disguise, no romantic subplot, and no church-based strategy for defeating the zombies. Instead, the zombie outbreak is caused by a sudden disruption to the Earth's axis from "polar fracking." The plot follows weary police officers who investigate murders, notice emptied graves, and slowly realize they are powerless. Hipster travelers are killed at a motel,

24

juveniles escape detention, and Zelda is revealed to be an alien who departs in a flying saucer. The film ends with the officers knowingly walking into death at the cemetery, observed by a hermit narrator who delivers a closing monologue and is spared, apparently due to his rejection of the consumerist values that caused the zombie apocalypse.

These are not alternate versions of substantially the same story, but entirely different and distinct narratives.

### 5.    Pace and Setting Reinforce the Absence of Substantial Similarity

The pacing and settings of the two works further underscore their dissimilarity. DEAD is fast-moving and action-driven. The zombie threat is established in a prologue, immediately draws Father Brady and Duckie into danger, and escalates rapidly through confrontations on Main Street, in the diner, at the medical center, and at the police station, before culminating in the climactic church sequence. The zombie attacks are gory and bloody.

TDDD adopts the opposite approach. Its pacing is deliberately slow and episodic, with long stretches devoted to mundane small-town life: officers cruising; conversations about coffee and donuts; a farmer complaining about a missing chicken; and a gas-station clerk reading horror magazines. The zombie attacks do not begin until later, and the film repeatedly pauses for contemplative scenes. The slow tempo is an intentional artistic choice evoking absurdist satire. In any event, "pace, without more, does not create an issue of overall substantial similarity between the works." *Williams,* 84 F.3d at 590.

The settings are also divergent. Although both works are set in small rural American towns, the expressive details are distinct. DEAD takes place in Peterborough, a New England town shaped by its long-standing relationship with zombies contained in a pit beneath the church. The town has a long, secret history of managing the undead through religious ritual. TDDD is set in Centerville, a deliberately unremarkable town defined by its ordinariness: a gas station; motel; hardware store;

25

juvenile detention center; and funeral home. There is no church-centered mythology or hidden history. Centerville's dullness is central to the film's satirical critique of consumer culture.

Plaintiff's focus on shared locations such as woods, diners, police stations, gas stations, and detention or medical facilities is unavailing. These are scènes à faire in any story set in a small American town, including a zombie story, and is not protectable expression. *Capcom Co., Ltd., supra*, 2008 WL 4661479 at *10 ("While both works are set in a rural two-story mall with a helipad on top and a gun shop and music playing inside, these locales represent scènes à faire that flow from the unprotectable idea of zombies in a mall."); *Walker*, 784 F.2d at 50 (holding that depicting a police story in New York's South Bronx and the 41st Precinct is not protected); *Williams*, 84 F.3d at 589 ("electrified fences, automated tours, dinosaur nurseries, and uniformed workers … are classic scènes à faire that flow from the uncopyrightable concept of a dinosaur zoo.").

The same is true of Plaintiff's isolated scene comparisons. The presence of a "town drunk" in a jail cell is a stock situation. *See Walker*, 784 F. 2d at 50 ("drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx."). Likewise, the idea of zombies interacting with food in a diner is unprotectable.

### 6.    Summary of the More Discerning Observer Test Factors

In sum, the "more discerning observer" test factors reveal that TDDD and DEAD are not substantially similar in protectable expression. The few similarities Plaintiff has alleged are driven by the wholly unprotectable idea of humans battling zombies in a small town during a zombie outbreak and related stock ideas and scènes à faire.  This is insufficient. *See Capcom Co., Ltd.*, *supra*, 2008 WL 4661479 at *7 (no protection for "concept of humans battling zombies in a mall during a zombie outbreak.").  Plaintiff's claim fails as a matter of law because the Copyright Act does not protect any of Plaintiff's claimed similarities, each of which falls squarely within the realm of unprotectable ideas, stock characters, or scènes à faire.

26

183190434

## V.    CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant this

motion and dismiss Plaintiff's TAC with prejudice.

Respectfully submitted,

Dated: May 29, 2026                                   FOX ROTHSCHILD LLP

/s/ *David Aronoff*_____
David Aronoff, Esq., *Admitted Pro Hac Vice*
Josh Bornstein, Esq., *Admitted Pro Hac Vice*
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
Tel:  (310) 228-2916
Fax: (310) 556-9828
daronoff@foxrothschild.com
jbornstein@foxrothschild.com

-and-

Andrew Ramstad, Esq., Bar No. 5929583
101 Park Ave 17th floor
New York, NY 10178
Tel:  (212) 878-7900
Fax:  (212) 692-0940
aramstad@foxrothschild.com

*Attorneys for Defendants*

183190434

## <u>WORD COUNT CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)</u>

I, David Aronooff, certify pursuant to Local Rule 7.1(c) that the foregoing brief complies with the word count limitations under the Local Rules and this Court's Standing Order.  The brief is 8,733 words, inclusive of all footnotes and exclusive of the brief's caption, table of contents, table of authorities, and signature block.  I have relied on the Microsoft Word's word count software to prepare this certification.

/s/ *David Aronoff*_____
David Aronoff, Esq.

28

183190434

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint, Memorandum of Law in support thereof, Declaration of David Aronoff, Notice of Lodging Exhibit "A," and Proposed Order were served upon Plaintiff via the Court's CM/ECF system; the authorities cited herein were separately emailed to Plaintiff at the email address on file with the Court; and Exhibit "A" was mailed to Plaintiff at the address on file with the Court:

Trevor Dellno Keeth
P.O. Box 7087
Rochester, MN 55903
Email: trevor.keeth@2tokens.com


/s/ *David Aronoff*
David Aronoff, Esq.


Dated: May 29, 2026

29

183190434