UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TREVOR DELLNO KEETH,
          Plaintiff,

     v.     Civil Action No. 1:25-cv-07221-KPF

JAMES R. JARMUSCH, and FOCUS
FEATURES, LLC,
          Defendants.


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

1

2

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT..............................................................................................................4

LEGAL STANDARD.........................................................................................................................5

ARGUMENT....................................................................................................................................6

    A. Substantial Similarity in Protected Expression.....................................................................6

    B. Copying and Access............................................................................................................20

    C. The Registration Argument.................................................................................................24

    D. The Exhibits Were Filed and Served..................................................................................25

    E. Dismissal With Prejudice Would Be Unwarranted.............................................................25

CONCLUSION................................................................................................................................26

## TABLE OF AUTHORITIES

*Cases*

*Ashcroft v. Iqbal, 556 U.S. 662 (2009)*..............................................................................................5
*Boisson v. Banian, Ltd., 273 F.3d 262 (2d Cir. 2001)*.........................................................6, 10, 20
*Briggs v. SCO Family of Servs., No. 16-cv-3882, 2021 WL 7209010 (E.D.N.Y. Oct. 20, 2021)*. .25
*Capcom Co. v. MKR Group, Inc., No. C 08-0904 RS, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008)*..............................................................................................................................................7
*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132 (2d Cir. 1998)*.5, 12
*Cavalier v. Random House, Inc., 297 F.3d 815 (9th Cir. 2002)*.......................................................10
*Erickson v. Pardus, 551 U.S. 89 (2007)*.............................................................................................5
*Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991)*...............................6
*Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC, 586 U.S. 296 (2019)*.....................25
*Gaste v. Kaiserman, 863 F.2d 1061 (2d Cir. 1988)*....................................................................21, 23
*Gill v. Mooney, 824 F.2d 192 (2d Cir. 1987)*....................................................................................23
*Global Network Communications, Inc. v. City of New York, 458 F.3d 150 (2d Cir. 2006)*..........22
*Harris v. Mills, 572 F.3d 66 (2d Cir. 2009)*........................................................................................5
*Hernandez v. Coffey, 582 F.3d 303 (2d Cir. 2009)*..........................................................................22
*Hogan v. DC Comics, 48 F. Supp. 2d 298 (S.D.N.Y. 1999)*............................................................10
*Jorgensen v. Epic/Sony Records, 351 F.3d 46 (2d Cir. 2003)*.....................................................21, 23
*Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996 (2d Cir. 1995)*......................................................6, 7
*LaChapelle v. Fenty, 812 F. Supp. 2d 434 (S.D.N.Y. 2011)*...............................................................7
*Laureyssens v. Idea Group, Inc., 964 F.2d 131 (2d Cir. 1992)*.........................................................21
*Peter F. Gaito Architecture, LLC v. Simone Development Corp., 602 F.3d 57 (2d Cir. 2010)*..6, 8
*Roth v. Jennings, 489 F.3d 499 (2d Cir. 2007)*.................................................................................22
*Sander v. Enerco Grp., Inc., No. 22-cv-8952, 2023 WL 1779691 (S.D.N.Y. Feb. 6, 2023)*..........25
*Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49 (2d Cir. 1936)*................................5, 7, 11
*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127 (2d Cir. 2003)*.5, 7
*Walker v. Schult, 717 F.3d 119 (2d Cir. 2013)*..................................................................................23
*Williams v. Crichton, 84 F.3d 581 (2d Cir. 1996)*..............................................................................7

*Statutes and Rules*

17 U.S.C. § 411(a).............................................................................................................................25

Fed. R. Civ. P. 12(d)..........................................................................................................................22

Fed. R. Civ. P. 56...............................................................................................................................22

Local Civil Rule 12.1 (S.D.N.Y.)................................................................................................. 4, 22

## I. PRELIMINARY STATEMENT

This is a Rule 12(b)(6) motion, not a merits trial. The question is not whether Defendants can articulate differences between the works — every infringer can — but whether the Third Amended Complaint ("TAC") plausibly alleges copying of protectable expression such that a reasonable jury could find substantial similarity. The TAC pleads specific overlapping expression anchored in the registered 2003 deposit copy already in the record (Dkt. 1-5), a plausible route of access, and overlaps so close that they independently support an inference of copying.

There is a procedural defect at the threshold. Defendants' motion relies on materials outside the pleadings — festival web pages cited at its footnote 4 — yet Defendants did not serve the notice Local Civil Rule 12.1 requires of a represented party moving against a pro se litigant on matters outside the pleadings. Those materials may not be considered on this motion. See infra Section III.B.1.

Defendants' motion frames this case at the wrong level of abstraction. The TAC does not allege that Plaintiff owns "zombies," small towns, or the name "Hank." It alleges that Defendants copied specific, identifiable expression from Plaintiff's registered screenplay DEAD: particular descriptive language used to introduce particular characters, particular scene constructions, particular staging, near-verbatim dialogue, and a sequence of corresponding story beats appearing in the same order. Defendants' motion never engages those allegations on their own terms. Instead, it relabels each pleaded example as a "trope," strips it of the language and context actually pleaded, and then argues that the relabeled abstraction is unprotectable. That method could defeat any copyright complaint ever filed, which is why the law does not permit it.

Defendants' motion proceeds in three moves. First, it recasts Plaintiff's allegations at a high level of generality — "humans battling zombies in a small town" — and attacks the recast version rather than the complaint Plaintiff actually filed. Second, it atomizes the pleaded examples, examining each in isolation so that no single fragment can carry the whole, while ignoring that the TAC pleads an interlocking pattern of overlaps occupying the same story slots in the same order. Third, it emphasizes material Defendants added — hipsters, teenagers, polar fracking, a hermit —

as though additions could erase what was taken. They cannot: "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (L. Hand, J.).

The motion's treatment of Plaintiff's own exhibits illustrates the approach. Defendants quote the independent reader's report attached to the original Complaint for the observation that "the two storylines do not unfold in the same way," and add: "She was right." Mot. at 3. Defendants omit the very next passage of the same report:

> "HOWEVER, despite the genre conventions and tropes, there are some very notable similarities in setting, characters, and details in the unfolding of the stories that stood out to me. Some unusual details appear to have been cherry-picked from Keeth's manuscript and used in Jarmusch's screenplay." Dkt. 1-3 at 2 (emphasis in original).

The report concludes that "some of these points of similarity are unlikely to be coincidental." *Id.* at 10. A reader retained for her ability to spot side-by-side copying — not zombie-genre expertise — found exactly that. Defendants' selective quotation of Plaintiff's exhibit, offered to convey the opposite of the exhibit's conclusion, is a fair preview of the motion's method throughout. The motion should be denied.

## II. LEGAL STANDARD

On a motion under Rule 12(b)(6), the Court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Plaintiff proceeds pro se, his pleadings are "to be liberally construed" and held "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

To establish unauthorized copying, a plaintiff must prove two distinct things. First, he must show that his work was "actually copied" — a factual question. Second, he must establish that "the copying amounts to an improper or unlawful appropriation" — that what was taken was protected expression, and that the amount taken is "more than de minimis." *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 137-38 (2d Cir. 1998); *Tufenkian Import/Export*

5

*Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003). Each element is addressed separately below: the substantial similarity of protected expression in Section III.A, and actual copying — access, probative similarity, and independent reader analysis — in Section III.B.

Where, as here, the works at issue are before the Court, the Court may compare them — but dismissal is appropriate only if "no reasonable jury, properly instructed, could find that the two works are substantially similar." *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 63 (2d Cir. 2010). The ordinary-observer test asks "whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Id.* at 66. Even where the "more discerning observer" standard applies because a work incorporates public-domain elements, the Second Circuit has cautioned that the inquiry is not piecemeal: the Court is not to dissect the works into separate components and compare only those elements which are in themselves copyrightable, but must remain guided by the works' "total concept and overall feel" and by common sense. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272-73 (2d Cir. 2001). And the original selection, coordination, and arrangement of even individually common elements is itself protectable expression. *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003-04 (2d Cir. 1995) (holding the "selection, coordination, and arrangement" of common elements protectable and the junior work infringing); *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 348 (1991).

## III. ARGUMENT

### A. The TAC Plausibly Alleges Substantial Similarity in Protected Expression

#### 1. Defendants' method — abstraction, atomization, and additions — does not answer the complaint Plaintiff filed

Defendants repeatedly recast Plaintiff's allegations at a high level of generality. Plaintiff does not allege merely "humans battling zombies in a small town during a zombie outbreak." Plaintiff alleges numerous specific similarities in protectable expression — pleaded example by

example, with page citations, and catalogued in Section III.A.5 below. Defendants' cases reflect the difference. In *Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996), and *Capcom Co. v. MKR Group, Inc.*, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008), those plaintiffs' similarities existed only at the level of shared premise — a dinosaur zoo; zombies in a mall. Neither plaintiff identified near-verbatim dialogue, parallel descriptive language, or corresponding scene construction. The TAC does. A claim built on pleaded specifics cannot be dismissed by citing cases about claims that had none.

Defendants' argument works only by breaking each pleaded example into a generic label — "cops," "diner," "shotgun," "town drunk" — instead of addressing what Plaintiff actually pleaded: particular phrasing, particular staging, and particular combinations of character roles and events. Copyright claims often turn on the cumulative effect of interlocking similarities, and the TAC alleges that cumulative pattern. Even when individual elements are common, the particular way they are selected and combined remains protected expression. *Knitwaves*, 71 F.3d at 1003-04. A defendant "may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work . . . are considered in relation to one another." *Tufenkian*, 338 F.3d at 133-34. And substantial similarity may be found even where the two works exist in entirely different media. *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 441-42 (S.D.N.Y. 2011) (denying motion to dismiss where a music video copied protected expression from still photographs). Three small-town law officers with closely corresponding names, introduced through closely corresponding descriptive passages, occupying the same roles, in the same locations, doing the same things, tied together with near-verbatim dialogue, is not a "trope." It is a pattern, and at the pleading stage a pattern of that kind makes copying plausible.

Defendants' substantial-similarity analysis also repeatedly relies on differences, additions, and later alterations while minimizing the expressive material Plaintiff alleges was copied. The law does not permit a defendant to avoid comparison by adding new material to a copied work. *Sheldon*, 81 F.2d at 56. Nor is the ordinary-observer inquiry conducted by examining only the

portions that differ — the test asks whether an observer who has not "set out to detect the disparities" would regard the works' aesthetic appeal as the same. *Gaito,* 602 F.3d at 66. Notably, the material Defendants emphasize as distinguishing consists of additions. Additions do not subtract; the question is what was taken. Defendants' "differences" are largely additions at the margin, while the spine of the story is where the overlaps live.

Defendants' brief labels every pleaded similarity a genre commonplace. That label confuses idea with expression — the distinction at the core of copyright law. Ideas are unprotected; expression is protected. Plaintiff claims no monopoly on the concept of a small-town zombie outbreak. What the TAC alleges Defendants copied is the distinctive selection, arrangement, and execution of scenes, characters, dialogue, and imagery — the protectable expression catalogued in Section III.A.2 below and in the roadmap that follows. Scènes à faire, by definition, are what every genre work shares; stock elements do not set a script apart. The features that distinguish Plaintiff's screenplay from its genre are the particular expressive choices the TAC identifies — details the independent reader report calls "unusual" (Dkt. 1-3) — and they are the same features Defendants' work reproduces.

### *2. The pleaded expression is anchored in the registered 2003 deposit, which is already before the Court*

The registered 2003 deposit copy of DEAD is in the record (Dkt. 1-5; Defs.' Ex. B), and the Court can verify directly that the expressive material at the center of the TAC appears there. By way of example only: the introduction of the law-enforcement group through the visual description of their identical gear, each with "a black canvas bag in one hand, a small sawed-off shotgun in the other" (Dkt. 1-5 at 9); the introduction of the town's secretly inhuman medical professional through the visual of makeup on dead flesh — "Light colored powder covers his face, a hint of rouge on his cheeks. It's not a great makeup job, but it gets him by" (*id.* at 12); the line "Some folks around here...just don't like to stay dead, is all" (*id.* at 42), which Defendants' screenplay renders as "so, the dead just don't want to die today"; the zombie town drunk asleep on a cot in a jail cell,

8

bottle in hand (*id.* at 40); zombies comically interacting with food in the town diner (*id.* at 36); the peculiar image of a character seizing a chicken leg and biting into it (*id.* at 9); the onomatopoeic visual cue ("POW!") preceding a catastrophic blow to a zombie's head (*id.* at 89); the armored protector's entrance, "a pistol on each hip and a cattle prod in each hand," stepping down into "the crowd of angry dead" (*id.* at 60); the hero disappearing beneath a pile of swarming zombies (*id.* at 96); the severed arm with the black wristwatch at the burial site (*id.* at 83); and the inhuman protector's departure at the end, catching keys and riding off with a farewell gesture (*id.* at 102). Each is registered 2003 expression, and each has a pleaded counterpart in Defendants' work.

### 3. Characters: the TAC pleads amalgamation and shared character-function, which Defendants' trait-by-trait method never addresses

Defendants identify individual differences between corresponding characters and treat those differences as dispositive. The existence of differing character traits, however, does not end the substantial-similarity inquiry. If it did, the addition, removal, or modification of a few characteristics would defeat comparison altogether. The relevant question is whether the works remain substantially similar in their protectable expression when viewed as a whole — not whether every trait of every character is identical. Copying is not defeated because the accused work alters or omits some character traits, or amalgamates several characters into one; the question is whether protectable expression remains recognizable in the defendant's characters and scenes.

The TAC expressly pleads "the transformation and amalgamation of two distinct characters from Dead into a single character in The Dead Don't Die" — Doctor Diedrich plus Captain Kephart — an allegation Defendants' brief identifies and then declines to analyze. DEAD contains a small-town medical professional who is secretly inhuman, conceals the fact with makeup, and maintains hidden back rooms — and, separately, an inhuman protector who wields a samurai sword, rescues the besieged protagonists, and departs at the story's end. Defendants' work combines those two figures into one: Zelda, a small-town funeral professional who is secretly inhuman, is introduced applying makeup to dead flesh, keeps "secret rooms," wields a samurai

9

sword, rescues the besieged officers, and departs at the end. Defendants respond that Zelda differs from each source character — of course she does; she is two of them. Treating an amalgamated character as dissimilar to each of its components, considered one at a time, is precisely the dissection *Boisson* forbids. 273 F.3d at 272-73.

Defendants' remaining character arguments depend on the same atomization. They dismiss the shared name "Hank" as coincidence in isolation, without addressing the pleaded context: the names of the three principal law-enforcement characters correspond as a cluster, the characters occupy the same roles and perform the same functions, and the "Hank" characters serve the same narrative function in both works — supporting townsfolk who are introduced through corresponding visual descriptions and later swell the zombie horde. One shared name proves little; a cluster of corresponding names attached to corresponding roles performing corresponding functions is a data point in a pattern. Defendants' authority says nothing different — *Cavalier* and *Hogan* — *Cavalier v. Random House, Inc.*, 297 F.3d 815, 828 (9th Cir. 2002); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) — hold that a name alone is insufficient, not that names are stricken from the cumulative analysis.

Plaintiff also notes what Defendants chose to place before the Court — and what they did not. Defendants lodged the released film (Ex. A) and Plaintiff's screenplay (Ex. B) — but not Defendant Jarmusch's own screenplay, the document most directly comparable to Plaintiff's. That document is nonetheless before the Court, by Plaintiff's doing: it was filed conventionally as Plaintiff's Exhibit F (Dkt. 17), precisely so the two screenplays could be read side by side. Defendants' briefing never engages it. Indeed, of the two screenplays already on the docket, Defendants elected to re-attach only Plaintiff's (their Ex. B) — pairing it with the film — while leaving Defendant Jarmusch's where it lay. The film is, of course, an accused work, and comparison to it is proper; it is a derivative of Jarmusch's screenplay, and whatever the screenplay took from DEAD, the film carried to the screen. But Defendants' briefing stages every comparison in the medium where performances, music, casting, and direction — none of it authored at the screenplay stage — supply the differences, and consistently uses the film's later character names

10

rather than those in Jarmusch's screenplay, an editorial choice that obscures the very correspondences the TAC pleads. Plaintiff's registered deposit staffs its town with a SHERIFF and DEPUTY DWAYNE DAWG. (Dkt. 1-5 at 8.) Defendants' deposited screenplay staffs its town the same way: "SHERIFF CLIFF ROBERTSON" and "DEPUTY DON PETERSON." (Dkt. 17 at 1.) The released film retitles them "Chief" and "Officer" — and renames Don as "Ronnie" — and it is the film's names, exclusively, that the motion uses for these characters. In the deposited texts, the titles match.

### 4. Plot, sequence, pace, and "total concept and feel" do not entitle Defendants to dismissal

Defendants describe the works' plots at opposite altitudes — Plaintiff's at the highest level of abstraction, their own at the level of granular detail — and then announce the results do not match. When the works are described at the same altitude, the TAC's sequencing allegations are concrete: corresponding beats, in corresponding order, executed with corresponding staging and language, as set out in the comparison below. As for tone, Defendants' emphasis on their work's deadpan satire and bleak ending does not resolve copying at the pleading stage: differences in tone and message can coexist with appropriation of protectable elements, and a defendant cannot insulate copying by changing the mood of what was taken. *Sheldon*, 81 F.2d at 56.

### 5. The works, side by side

For ease of side-by-side review, each example below quotes Plaintiff's registered 2003 screenplay first (Dkt. 1-5, with the deposit page given for each excerpt) and then the corresponding excerpt from Defendants' work, so the aligned language can be compared line for line in the order in which it was written. The examples are presented in narrative order rather than in order of strength, because the sequence itself is part of what was copied: these are corresponding beats appearing in substantially the same sequence in the two works. Where a corresponding beat has been repositioned — Defendants introduce their officers on their first page, while Plaintiff's equivalent introduction arrives on page nine; Plaintiff introduces his concealed inhuman medical

professional far earlier than Defendants introduce theirs — the relocation of copied material does not defeat copying. Discrete copied elements scattered through an accused work remain actionable. See *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 140 (2d Cir. 1998) (discussing "fragmented literal similarity").

**Characters / Role Correspondences**

|  | **DEAD (Dkt. 1-5)** | **Defendants' work** |
|---|---|---|
| **The station squad** | Sheriff | Sheriff Robertson |
|  | Deputy Dwayne Dawg | Deputy Don Peterson |
|  | *Brady (2003), renamed "the Rookie" (2016 — see § III.B.2)* | *the third officer (Mindy; "Ronnie" in the film)* |
| **The inhuman medical professional** | Doc Diedrich | Zelda Winston (dual roles) |
| **The inhuman swordsman-protector** | Captain Kephart | Zelda Winston (dual roles) |
| **The sidekicks** | Hank | Hank Thompson |
|  | Earl | Ronnie Perkins |

The examples that follow are illustrative, not exhaustive: the independent reader report separately documents parallels between the works that are not catalogued here. (Ex. B, Dkt. 1-3.)

Where an example includes Plaintiff's 2016 revision (Dkt. 1-6), that text is offered as evidence of copying and of the pleaded access window — including where the revision's wording moves toward Defendants' text — not as an independent basis of liability, which rests on the registered 2003 deposit (Dkt. 1-5).

**1. Introducing The Town Via The Visual Of A Welcome Sign That Has A Blank Where The Population Should Be**

**DEAD, 2016 revision (Dkt. 1-6 at 8):** A faded billboard reads "Welcome to Coffin's Bluff. Pop //" The space where a number would be is faded and illegible.

**Defendants' work (Dkt. 17 at 4):** A hand painted sign on the edge of a semi-rural highway reads: WELCOME TO CENTERVILLE, POP [TBD]

### 2. The Dead Emerge From The Grave Via The Visual Of Hands and Forms Rising

**DEAD, registered 2003 deposit (Dkt. 1-5 at 3):** A pair of leather-gloved hands scramble their way out of the pit and grab the priest by the hair. They drag the body into the hole, head first. As the priest's legs disappear into the abyss, another pair of hands scramble into view. They are dead, rotten, skeletal hands. They grab hold of the stone ledge and begin to climb.

**Defendants' work (Dkt. 17 at 23):** in the darkness, A HUMAN-LIKE FORM appears to have emerged halfway out of the dirt. It pulls itself all the way up and eventually stands unsteadily, on two feet. as it staggers slowly forward, A SECOND FORM, a hand and arm, emerges from the ground beyond it, adjacent to the another gravestone. Eventually THIS FIGURE pulls itself to its feet and soon follows the first one.

### 3. The Officers - Introduced Via The Visual Description Of Their Matching Gear And

#### Shotguns

**DEAD, registered 2003 deposit (Dkt. 1-5 at 9):** The Sheriff, Deputy Dawg, Hank, and Earl size up the scene, all wearing identical black, padded leather armor. Each has a black canvas bag in one hand, a small sawed-off shotgun in the other.

**DEAD, 2016 revision (Dkt. 1-6 at 12):** The Sheriff, Deputy Dawg, Hank, and Earl size up the scene. They all wear the identical, black, padded leather armor of the Coffin's Bluff Zombie Squad. Each has a black canvas bag in one hand and a small, sawed-off shotgun in the other.

**Defendants' work (Dkt. 17 at 1):** Two officers, SHERIFF CLIFF ROBERTSON … and DEPUTY DON PETERSON … are walking away from the car and entering a wooded area. Both men wear the khaki uniforms of small town police officers, and both wear similar, but not identical, retro looking eyeglasses with thick dark frames. DEPUTY PETERSON cradles a pump-action 12 gauge shotgun.

*Both works also deploy the same two-step introduction of their officers: first the police vehicle stopped beside a rural road — Defendants: "A generic, slightly aging, police cruiser has pulled off a country highway and stopped down a narrow dirt road on the edge of a rural field" (Dkt. 17 at 1); Plaintiff: "…they pass a police car, parked on the side of the road. A cop stands in front of it by some broken guardrails, looking off into the woods" (Dkt. 1-5 at 6) — and then the officers themselves, through the visual description of their uniforms and weapons, in the same of-genitive grammatical structure of the 2016 revision's sentence, above.*

### 4. The Station - The Primary Location *(emphasis added)*

**DEAD, registered 2003 deposit (Dkt. 1-5 at 8):** INT. SHERIFF'S STATION — CONTINUOUS — The pale DWAYNE DAWG sits at his desk in the center of the room. A few empty cells line the side wall.

13

**DEAD, 2016 revision (Dkt. 1-6 at 10):** Beside him stands the SHERIFF … The ROOKIE sits nearby, typing up a report.

**DEAD, 2016 revision (Dkt. 1-6 at 29):** … Dwayne sits at the desk and watches him, *sipping coffee from a paper cup* and swinging his keys.

**Defendants' work (Dkt. 17 at 16):** INT. POLICE STATION — Sheriff Robertson stands in one of the station's only two jail cells … Mindy sits on top of the main desk, her crossed legs dangling, *drinking coffee from a paper take-out cup*. Deputy Peterson sits behind another desk tidying up a stack of papers.

### 5. The Secret Inhuman Medical Professional Introduced Via The Visual Of Makeup On

### Dead Flesh *(emphasis added)*

**DEAD, registered 2003 deposit (Dkt. 1-5 at 12):** …the obvious fact that he is wearing makeup. Light colored powder covers his face, *a hint of rouge* on his cheeks. It's not a great makeup job, but it gets him by.

**DEAD, 2016 revision (Dkt. 1-6 at 14):** …heightened by the obvious fact that he is wearing *heaps of makeup*.

**Defendants' work (Dkt. 17 at 58):** …with a soft brush she carefully applies the last *touches of rouge* to the pallid cheeks of the FEMALE GOLFER.

*Production evolution: the 2016 revision added the word "heaps" — "heaps of makeup." Defendants' screenplay introduces Zelda in a single line: "with a soft brush she carefully applies the last touches of rouge to the pallid cheeks…" But the Focus Features released film introduces her applying heavy, conspicuously imperfect makeup to a corpse (Ex. A at 01:01:14–01:01:23) — closer to Plaintiff's registered 2003 description ("not a great makeup job") and his 2016 addition ("heaps of makeup") than to Defendant Jarmusch's own screenplay ("the last touches of rouge").*

### 6. The Visual Of Biting Chicken Legs

**DEAD, registered 2003 deposit (Dkt. 1-5 at 9):** Harper picks up a chicken leg and bites into it. He makes an angry sound and spits it out, throwing the chicken leg across the table at his family.

**Defendants' work (Dkt. 17 at 94):** He picks up the dirty, half eaten chicken leg from the ground next to him and takes a big bite.

### 7. The Sheriff Gets A Warning Call

**DEAD, registered 2003 deposit (Dkt. 1-5 at 25-26):** EARL (O.S.): Sheriff, you there?… DWAYNE: He's out at the church with Hank. I think. EARL (O.S.): I was afraid of that…

**Defendants' work (Dkt. 17 at 28-29):** This is Sheriff Robertson. (pause) Yeah, hi Hank. What's up?… SHERIFF ROBERTSON: What? (pause) At the diner?

14

**8. Someone Vomits, Asks If They Are Needed, And Is Sent Away To Handle The Crowd**

> **DEAD, registered 2003 deposit (Dkt. 1-5 at 10):** SHERIFF: Earl, get the family out of here. Earl drops his bag to the floor, holsters his gun, and moves to lead Harriette and the kids out of the room. EARL: Give a holler if you need me.

> **DEAD, 2016 revision (Dkt. 1-6 at 12):** Earl drops his bag and vomits. DWAYNE: Again?! SHERIFF: Earl, why don't you go help the Rookie? Get the family out of here. EARL: Yeah, okay. Sorry, Sheriff. Wiping at his mouth, Earl holsters his shotgun on his back and helps the Rookie lead Harriette and the kids out of the room. EARL (CONT'D): Give a holler if you need me.

> **Defendants' work (Dkt. 17 at 31) (second ellipsis in original):** Do you need me here? … SHERIFF ROBERTSON: Maybe you can… maybe you can take care of crowd control. Mindy goes over to the three citizens milling outside the window. … SHERIFF ROBERTSON glances over just in time to see her bend behind the car and hear her vomiting.

**9. The Zombies Arrive Down Main Street Introduced Via The Visual Of Their Unique**

**Burial Clothing**

> **DEAD, registered 2003 deposit (Dkt. 1-5 at 27):** Some are in funeral dress, some naked, all in various states of horrid decay.

> **DEAD, 2016 revision (Dkt. 1-6 at 32):** Some are in funeral dress, some naked, a couple even in football uniforms. All of them are in various states of decay.

> **Defendants' work (Dkt. 17 at 61):** Some are dressed as though for Sunday school - others super heroes, athletes, halloween characters, boy scouts, etc. All are covered in a considerable amount of dirt.

**10. The Zombies Play With Their Food In A Classic 50's Diner**

> **DEAD, registered 2003 deposit (Dkt. 1-5 at 36):** A zombie pours salt on a plate of raw meat. He looks at the salt shaker for a moment, then throws it over his shoulder for luck. It smacks into the forehead of the zombie behind him, who looks up from the foot he's eating in alarm, watching out for whoever must've hit him.

> **Defendants' work (Dkt. 17 at 25) (quotation marks in original):** the female spots the partially-full cups of coffee still on the counter. Immediately, her eyes widen with wild delight as she attempts to "throw" the coffee from the cups into her mouth. She gurgles happily as THE MALE watches.

**11. The Dead Town Drunk Sleeping On A Cot In The Jail Cell — A Multi-Beat, Multi-Page**

**Sequence** *(emphasis added)*

**DEAD, registered 2003 deposit (Dkt. 1-5 at 34):** The door to the next cell slams shut with a loud clatter … we hear someone heavy lay down *on the cot* inside.

**DEAD, registered 2003 deposit (Dkt. 1-5 at 40):** We finally get to see *the other cell*, side by side with Duckie's. A *zombie is sitting up on the cot*, his back to the wall. He *appears to be sleeping*, a bottle of rum in his hand. SHERIFF: … Remember how he'd save us the trouble of rounding him up and just come on in here *to sleep it off*? … He was a *town drunk*. Died before your time.

**DEAD, registered 2003 deposit (Dkt. 1-5 at 47):** We've got rules about this, I'm afraid. Cops and Collars only. You stay here. DUCKIE: *I am not staying here*, by myself… (he points at the drunk zombie) … in the same room as that.

**Defendants' work (Dkt. 17 at 24):** The door to the cell is unlocked, as is the other cell - inside it is the corpse of Marty O'Brien, *former town drunk*, completely covered by a white sheet. As SHERIFF ROBERTSON *continues to snore, in the next cell* …

**Defendants' work (Dkt. 17 at 28):** …illuminates SHERIFF ROBERTSON, asleep *on the cot*

**Defendants' work (Dkt. 17 at 56):** There, the corpse of MARTY O'BRIEN *is sitting upright and staring straight* at her.

**Defendants' work (Dkt. 17 at 71):** "I guess we should probably get in the patrol car, some of us anyway, and patrol the community…" Mindy: "*Well, I am not staying in here.*"

**12. The Thesis Line**

**DEAD, registered 2003 deposit (Dkt. 1-5 at 42):** SHERIFF: Some folks around here…just don't like to stay dead, is all.

**Defendants' work (Dkt. 17 at 59):** ZELDA: so, the dead just don't want to die today?

*Nearly word for word: (some)(folks around here)(just don't like)(to stay dead) / (so)(the dead)(just don't want)(to die).*

**13. The Secret Rooms Of The Inhuman Medical Professional**

**DEAD, registered 2003 deposit (Dkt. 1-5 at 53):** If it had been closed, you'd never know it was there. He looks back over his shoulder at the Sheriff and Brady, and nods in the direction of hidden room beyond… INT. SECRET LAB — CONTINUOUS

**DEAD, 2016 revision (Dkt. 1-6 at 51) (ellipsis in original):** DOC DIEDRICH: The formula is in... a back room, in my office.

**Defendants' work (Dkt. 17 at 20) (second ellipsis in original):** INT. BACK ROOMS OF THE FUNERAL PARLOR … Well what's it like in the… you know, in those secret rooms in the funeral home since she took it over? …in those creepy back rooms.

16

*In both works these are the same place: rooms hidden inside the lair of the concealed non-human medical professional.*

## 14. The Inhuman Swordsman — Armed In Both Hands, Advancing Alone Into The Dead

### While The Cops Watch Through A Window, Amazed

**DEAD, registered 2003 deposit (Dkt. 1-5 at 60):** ZOMBIE CAPTAIN KEPHART steps out. This zombie, though, is a bit different than the rest. For starters, he's decked out in the familiar armored suit of the town's Zombie Squad. A pistol on each hip and a cattle prod *in each hand,* he steps down the stairs into the crowd of angry dead. Sheriff and Deirdre watch on, amazed, as Kephart shoves his cattle prods into the mass of zombies.

**DEAD, registered 2003 deposit (Dkt. 1-5 at 65-66):** As they watch through the window, Zombie Captain Kephart returns to the scene … Duckie: What in the hell is that?

**Defendants' work (Dkt. 17 at 70):** Striding confidently toward the station and crossing the street in front of it is ZELDA WINSTON. She is dressed in her trench coat … *in each hand* she grips a katana with complete self-assurance. … Gathered behind the barred front window SHERIFF ROBERTSON, DEPUTY PETERSON and MINDY have just witnessed, with some amazement, ZELDA'S actions while approaching. DEPUTY PETERSON: Darn, she's good with those blades, isn't she?

### 15. The Visual Of A Zombie's Face Being Removed Via Onomatopoeia

**DEAD, registered 2003 deposit (Dkt. 1-5 at 89):** POW! A thunderous right hook twists the zombie's head around 200 degrees on its neck.

**DEAD, 2016 revision (Dkt. 1-6 at 91):** POW! Duckie's right hook is pure power. He hits the zombie in the nose, and the zombie's face collapses

**Defendants' work (Dkt. 17 at 63):** BLAM! The shotgun blast leaves a large hole in the center of the ZOMBIE's head, essentially removing its face.

## 16. Two Carefully Aimed Shots From The Oversized Revolver In The Instant Before Being

### Overrun

**DEAD, registered 2003 deposit (Dkt. 1-5 at 77** *(emphasis added)***):** The Crony *fires off two* slow, *carefully aimed* shots from his *large revolver* before the truck slams into him.

**Defendants' work (Dkt. 17 at 53-54** *(emphasis added)***):** he quickly pulls up a *big .357 handgun … planting both feet* and *aiming* the gun. *He fires two shots* into the chest of the nearest invader

*Stripped of the added adjectives and stage business, the skeleton is identical: a lone defender fires two carefully aimed shots from an oversized revolver in the moment before he is overrun.*

17

### 17. So Many Zombies, They Can't All Fit Through The Door

**DEAD, registered 2003 deposit (Dkt. 1-5 at 82):** The zombies turn and shamble as fast as they can for the exit … The zombies are backed up at the door, all too eager to get out, and none able.

**Defendants' work (Dkt. 17 at 64):** …MORE ZOMBIES who are trying to squeeze in through the door.

**Defendants' work (Dkt. 17 at 26):** After some physical difficulty and bumping into one another, they are able to operate the glass door, swinging it open and exiting the diner.

### 18. The Final Plan, Improvised

**DEAD, registered 2003 deposit (Dkt. 1-5 at 77):** SHERIFF: Where are we going? BRADY: We're going to get them to come to us.

**DEAD, 2016 revision (Dkt. 1-6 at 83):** Forget trying to find them all. If we can we make this town think it's time for Sunday morning church, they might just all come to us. SHERIFF: And then what? The Rookie shrugs. ROOKIE: We improvise.

**Defendants' work (Dkt. 17 at 48, 49):** SHERIFF ROBERTSON: Are we improvising here? … Deputy Peterson: Is our plan to continue to inform people about the zombie danger before it gets dark?

### 19. The Visual Of The Severed Arm And The Wristwatch

**DEAD, registered 2003 deposit (Dkt. 1-5 at 83, 84):** Still there, near the edge, lays the severed arm of Father Dan, the black wristwatch above the hand. … Sheriff scans the floor and reaches for the severed arm of the Priest.

**Defendants' work (Dkt. 17 at 69):** …his left hand clutching a limp dark-skinned severed arm, a blingy watch still attached to its wrist.

### 20. Two Men Sit In Silence For A While

**DEAD, registered 2003 deposit (Dkt. 1-5 at 89):** Dwayne and Earl sit on the ground, their backs to the remaining unmolested car. They sit in silence for a while, looking off down the road.

**Defendants' work (Dkt. 17 at 66):** The two men remain sitting there for a while, not speaking, looking off into space.

### 21. The Inhuman Swordsman Cuts Off Heads So Neatly The Head Falls Off First And, After A Pause, The Body Follows

**DEAD, 2016 revision (Dkt. 1-6 at 101):** SWOOSH! Captain Kephart's samurai sword arcs outward for just an instant. In the blink of an eye, it is sheathed again. He walks past, leaving the zombie standing there. But only for a moment. As Kephart walks away, the zombie's head slowly tilts backwards, revealing the razor thin cut of the blade. The head slides off and the body finally drops.

18

**Defendants' work (Dkt. 17 at 59):** With one lightning fast motion the blade flies through the air and slices through the necks of both ZOMBIES leaving a slowly darkening line of dust across their plaid throats. Zelda pauses and watches… A moment passes before the ZOMBIE GOLFER heads … fall off their necks and into their respective coffins … after another brief pause, the body of each headless ZOMBIE falls back into their respective coffins.

## 22. The Visual Of Heads As Inflatable Balls, And Being Held Aloft By Zombies

**DEAD, registered 2003 deposit (Dkt. 1-5 at 95):** Hollis' head flies off over the crowd and out of sight … In the distance, the head is bouncing around the top of the crowd like a beach ball on graduation day.

**Defendants' work (Dkt. 17 at 70):** Their lopped-off heads roll around her feet like deflated volleyballs

**Defendants' work (Dkt. 17 at 87):** Farmer Miller is screaming and kicking as the ZOMBIES [# TBC] hold him aloft — almost as though he's crowd surfing.

## 23. The Hero Disappears Under A Pile Of Zombies

**DEAD, registered 2003 deposit (Dkt. 1-5 at 96):** Then, all at once, they rush him. As Duckie disappears under a mass of bodies, the CHURCH BELL begins to ring.

**DEAD, 2016 revision (Dkt. 1-6 at 99):** Duckie disappears under a pile of zombies as the CHURCH BELL begins to ring.

**Defendants' work (Dkt. 17 at 94):** SHERIFF ROBERTSON'S shotgun now goes off into the air, and he soon disappears beneath the clamoring zombies… DEPUTY PETERSON almost immediately suffers the same fate, and soon also disappears from view. The GHOULS now swarm over both men, covering them as though in macabre football pileups.

## 24. The Visuals Of Moonlight, And The "Wake" Of Zombies Behind The Inhuman

### Swordsman

**DEAD, registered 2003 deposit (Dkt. 1-5 at 30):** The moonlight spills through the trees to REVEAL a grizzly marathon of zombies in their wake.

**DEAD, registered 2003 deposit (Dkt. 1-5 at 97):** Duckie jumps in line behind, following in his wake.

**Defendants' work (Dkt. 17 at 23):** Pale moonlight spills down onto the gravestones and small above-ground crypts

**Defendants' work (Dkt. 17 at 52):** Now moonlight spills over the graveyard and its gravestones

**Defendants' work (Dkt. 17 at 71):** …and a visible wake of heads and bodies left by ZELDA's Samurai blades.

19

*Plaintiff's single registered sentence appears split across three of Defendants' passages: the distinctive verb — moonlight that "spills" — surfaces in two, and the distinctive noun — a "wake" (a trailing disturbance) — in the other. Across both works, the word "wake" here refers to the space behind the Inhuman Swordsman as they slice their way through the dead.*

### 25. The Keys Are Handed To The Inhuman Swordsman

**DEAD, registered 2003 deposit (Dkt. 1-5 at 102):** He lowers his other hand to his pocket, passing the gun tucked there, and comes up with *the keys* to the bike. He *tosses them to* the Captain.

**Defendants' work (Dkt. 17 at 72):** ZELDA WINSTON: May I barrow [sic] the keys to your personal vehicle? DEPUTY PETERSON: Uh, okay. He retrieves *the keys* from his pocket, then *tosses them to* her.

### 26. The Inhuman Swordsman And Inhuman Medical Professional Depart As The Story

### Closes

**DEAD, registered 2003 deposit (Dkt. 1-5 at 102):** Kephart grins as he catches the keys. The engine roars and the zombie rides off down the road, lifting his hand in a wave good-bye.

**DEAD, 2016 revision (Dkt. 1-6 at 105):** A road map is stretched out on the dash board. The Doctor begins to tap his fingers in time to the radio as the car leaves us and heads off into the distance.

**Defendants' work (Dkt. 17 at 92):** The saucer begins spinning more and more rapidly, then quickly lifts upward and away, soon disappearing beyond the dim horizon.

Defendants may respond, as their motion does, that any one of these moments could occur in any zombie story. Plaintiff's claim does not rest on any one of them. It rests on all of them: the same expressive choices, serving the same story functions, in substantially the same sequence, anchored by the same dialogue, locations, and character names — a cumulative, interlocking pattern that an ordinary observer, not hunting for disparities, would recognize at once. That is a question for the finder of fact, not for a motion to dismiss.

### B. The TAC Plausibly Alleges Copying

Actual copying may be established by direct or indirect evidence, and indirect evidence includes "access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267-68 (2d Cir. 2001)

20

(quoting *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992)). The TAC pleads each form: access through the industry channels alleged in ¶ 3, the probative similarities catalogued in Section III.A.5, and the independent reader analysis attached as Exhibit B (Dkt. 1-3). Copying may thus be shown by access plus similarities probative of copying, or by similarities "so striking as to preclude the possibility that plaintiff and defendant independently arrived at the same result." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51, 56 (2d Cir. 2003); *Gaste v. Kaiserman*, 863 F.2d 1061, 1067-68 (2d Cir. 1988). The two operate in an inverse relationship: "the stronger the proof of similarity, the less the proof of access is required." *Jorgensen*, 351 F.3d at 56 (quoting 4 Nimmer on Copyright § 13.03[D]). The TAC adequately pleads both routes. The pleaded access is festival-and-database circulation, not bare corporate receipt.

### 1. Access is plausibly alleged — and Defendants' motion attacks an access theory Plaintiff never pleaded

The TAC alleges that DEAD won positive festival placements in 2003, resulting in industry circulation; that Plaintiff revised the screenplay in 2016 and resubmitted it to multiple festivals — among them the 2016 Austin Film Festival, where Defendant Jarmusch premiered a film — again earning positive placement; and that the screenplay was submitted to The Black List, an industry database used by producers and directors. TAC ¶ 3. At the pleading stage, access requires a "reasonable opportunity" to encounter the work — not proof that the defendant in fact read it. Jorgensen, 351 F.3d at 51. A screenplay placed into festival and industry-database channels in 2003 and again in 2016 pleads a reasonable opportunity to encounter it. That is all Rule 8 requires.

Defendants' contrary argument attacks a complaint Plaintiff did not file. They invoke the rule that "[w]hen access is alleged through a third-party, as here, the intermediary... must have had a close relationship with the defendant," Mot. at 13 — but the TAC pleads no intermediary at all, identified or otherwise. Every access case Defendants cite involves a plaintiff who claimed that some named or unnamed person handed the work to the defendant. See Mot. at 13–14 (citing Hord, Wager, Castro, and Jones). Plaintiff's theory is different in kind: direct exposure through the

21

festival and database channels themselves. Defendants' demand for a pleaded intermediary with a "close relationship" is a demand to satisfy the elements of someone else's access theory.

Defendants' footnote 4, which relies on festival blog posts from outside the pleadings, should be disregarded. On a Rule 12(b)(6) motion, the Court accepts the complaint's well-pleaded factual allegations as true and may not consider extrinsic internet materials to resolve factual questions against the pleader. See *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (judicial notice extends to the fact that a statement was made, not its truth). The blog posts fit none of the recognized exceptions: they are not attached to the TAC, are not incorporated in it by reference, and are not integral to it — Plaintiff did not rely on them in framing his allegations and nowhere references them. They may therefore be considered, if at all, only upon conversion under Rule 12(d).

Separately, Local Civil Rule 12.1 provides an independent reason to disregard Defendants' footnote-4 materials. Defendants are represented, Plaintiff proceeds pro se, and footnote 4 reaches outside the pleadings to festival blog posts; yet no Rule 12.1 notice accompanied the motion. The blog posts therefore may not be used to resolve a factual question against Plaintiff on a Rule 12(b)(6) motion, *see supra*; nor can they transform this motion into one for summary judgment unless the Court formally converts it and Plaintiff first receives the notice and opportunity to respond that Local Rule 12.1 and Rules 12(d) and 56(d) require — notice the Second Circuit holds a pro se party must receive in "unequivocal" terms before any such conversion. *Hernandez v. Coffey*, 582 F.3d 303, 307–08 (2d Cir. 2009). Should the Court be inclined to consider any matter outside the pleadings, the proper course is conversion under Rule 12(d), with notice and an opportunity for Plaintiff to take discovery and submit his own evidence under Rule 56(d) — not selective consideration of Defendants' extrinsic materials alone.

***2. The similarities themselves support the inference of copying — and the***

***overlaps tracking the 2016 revision pinpoint the access window***

Independently, striking similarity can itself support an inference of copying. *Gaste*, 863

F.2d at 1067-68. And for the limited purpose of proving actual copying — as distinct from

improper appropriation — the law considers similarities probative of copying, see *Jorgensen*, 351

F.3d at 51, including matches in material that cannot support liability standing alone. The overlaps

that track Plaintiff's 2016 revision are offered for that limited purpose: as circumstantial evidence

of copying and of the access window, not as independent bases of liability. Plaintiff's infringement

claim remains anchored at all times in protectable expression contained in the registered 2003

deposit.

That principle matters here for a specific reason. The registered 2003 deposit already staffs

the small-town squad with a junior member — "Brady" (Dkt. 1-5 at 4) — and Defendants' work

likewise staffs its station with a trio that includes a junior newcomer, named "Ronnie" in the

released film. Plaintiff alleges he resubmitted the work through the 2016 festival-circuit and Black

List channels. TAC ¶ 3. To the extent Defendants' work also echoes features Plaintiff developed in

his later revision, those overlaps are offered on the same limited basis; liability rests at all times on

the registered 2003 deposit.

Because Plaintiff proceeds pro se, the Court may also consider factual allegations made in

his papers opposing the motion, to the extent they are consistent with the TAC. *Walker v. Schult*,

717 F.3d 119, 122 n.1 (2d Cir. 2013); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)

(considering a pro se plaintiff's affidavit submitted in opposition to a motion to dismiss). The

following facts, set out in the accompanying declaration and its exhibits, supplement and are

consistent with the TAC's allegation that the screenplay earned positive festival placements

resulting in industry circulation. TAC ¶ 3.

First, Screamfest publicly listed DEAD among the finalists of its 2003 screenplay

competition, and again among the "Semi-Finalists" of its 2016 competition. (Keeth Decl. Ex. H.)

Second, on December 5, 2016 — within the pleaded access window, and years before Defendants'

23

film — a Screamfest reader, in coverage of Plaintiff's 2016 submission, wrote that it "sets itself apart from the likes of Sean of the Dead [sic], Zombieland and Cockneys vs Zombies by giving the zombies endearing personality attributes and allowing them to play a more complex, active role in the film's plot." (Keeth Decl. Ex. I.) The reader wrote that the script "demonstrates a very clear flair for writing visually," and quoted its dialogue verbatim — "Some folks around here ... Just don't like to stay dead, is all" — the very line catalogued above as Example 12. (*Id.*) Third, in the summer of 2004, industry readers located the work through its Screamfest listing: in July, a screenwriter unaffiliated with Plaintiff found the finalist listing and requested a copy (Keeth Decl. Ex. G); and in August, the head of development at a Los Angeles production company wrote that he had "contacted Screamfest," that the festival "gave me your email," and that he had "recently read a breakdown" of the screenplay, and requested a copy — which Plaintiff sent in reply on August 16, 2004, attaching the screenplay as a PDF bearing his Writers Guild registration number. (Keeth Decl. Ex. J.) Both are offered as to the dissemination and public availability of the registered screenplay — the industry circulation the TAC pleads — not as proof of any Defendant's access.

The distinction between these materials and the festival blog posts in Defendants' footnote 4 is doctrinal, not rhetorical: a pro se plaintiff's supplemental facts are considered because they support allegations that must be accepted as true at this stage, while a movant's extrinsic materials offered to defeat the pleading remain excluded absent conversion. *See supra* Section III.B.1.

## C. The Registration Argument Identifies No Basis for Dismissal

Defendants argue that any claim "based on material present only in [the] unregistered 2016 draft must be dismissed." Mot. at 12. The argument misfires twice.

First, the claim is anchored in the registered 2003 deposit. TAC ¶ 1. As demonstrated in Section III.A.2 above — with citations to the deposit copy already in the record at Dkt. 1-5 — the expressive material at the heart of the TAC's comparisons appears in the registered work. The

Court need not resolve any question about later-added material to deny dismissal, because the TAC plausibly alleges copying of registered expression.

Second, Defendants' authorities address a different problem. The registration cases Defendants invoke (Mot. at 12–13) concern plaintiffs who sued without a registration in hand, in violation of 17 U.S.C. § 411(a) and *Fourth Estate*. Plaintiff registered DEAD years before filing suit. At most, Defendants' cases mean that material appearing only in the unregistered 2016 revision cannot independently support liability — and Plaintiff does not contend otherwise. As explained in Section III.B.2, the 2016-tracking overlaps are offered as evidence of copying and of the access window, a purpose for which registration is not required. See § III.B.2, *supra*.

### D. The Exhibits Were Filed and Served; Defendants Identify No Prejudice

Defendants note that the TAC references Exhibits A through E "although none were re-filed." Mot. at 4. The exhibits were filed with the original Complaint and remain on the docket (Dkts. 1-1 through 1-6); Plaintiff thereafter filed an updated exhibit list adding Exhibit F, Defendant Jarmusch's registered screenplay deposit for The Dead Don't Die (Dkt. 37), and a Notice of Conventional Filing explaining how that screenplay was provided to the Court (Dkt. 17). Plaintiff served the exhibits and the updated list on Defendants together with the Second Amended Complaint on January 13, 2026 (Focus Features, LLC) and January 20, 2026 (Defendant Jarmusch). Defendants do not claim they lack the materials, could not review them, or suffered any prejudice — because they cannot. Indeed, Defendants' own motion attaches and relies on Plaintiff's Exhibit B. A complaint is not dismissed because previously filed and served exhibits were not mechanically re-attached to each amendment. The result is the same under the liberal-construction line: in light of a plaintiff's pro se status, the Court may "consider[ ] the factual allegations set forth in the original Complaint, the Amended Complaint, and Second Amended Complaint, as well as their respective attachments." *Sander v. Enerco Grp., Inc.*, 2023 WL 1779691, at *4 (S.D.N.Y. Feb. 6, 2023) (quoting Briggs v. SCO Family of Servs., 2021 WL 7209010, at* 2 (E.D.N.Y. Oct. 20, 2021)).

**E. In Any Event, Dismissal With Prejudice Would Be Unwarranted**

Defendants ask for dismissal with prejudice. Even if the Court were to find any aspect of the pleading insufficient, Plaintiff has at each stage conformed his pleading to the Court's guidance — including by adding the concrete, side-by-side examples of copying the Court invited — and any remaining defect would be one of articulation, curable by amendment. Where a pro se plaintiff has demonstrably specific factual material available, dismissal with prejudice is inappropriate. If the Court concludes more is required, Plaintiff respectfully requests leave to amend. By way of specific proffer: an amendment would formally plead the supplemental facts set forth in Section III.B.2 — the Screamfest placements, the December 2016 reader coverage singling out protected expression that later appears in Defendants' work, and the 2004 industry requests and delivery — and would attach the supporting exhibits. (Keeth Decl. Exs. G–J.)

## IV. CONCLUSION

The TAC pleads specific, registered expression copied into Defendants' work; a plausible route of access through pleaded industry channels; and overlaps close enough to support the inference of copying on their own. Whether the works are substantially similar is, on these allegations, a question for the finder of fact — one the ordinary observer can resolve by doing what Defendants' motion never does: looking at them, side by side. The most direct test requires no advocacy at all: take the works in the order in which they came into existence — Plaintiff's registered screenplay (Dkt. 1-5), then Defendant Jarmusch's screenplay (Plaintiff's Ex. F), then the released film (Ex. A). Unlike Defendants, Plaintiff asks the Court to look away from nothing — only to look at everything, in the order it was written. The motion to dismiss should be denied. In the alternative, Plaintiff requests leave to amend.

Respectfully submitted,

Dated: July 9, 2026

/s/ Trevor Dellno Keeth

Trevor Dellno Keeth, Pro se Plaintiff
P.O. Box 7087
Rochester, MN 55903
(507) 321-9740
trevor.keeth@2tokens.com

27

**WORD COUNT CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)**

I, Trevor Dellno Keeth, certify pursuant to Local Civil Rule 7.1(c) and the Court's Individual Rules of Practice that the foregoing memorandum complies with the applicable word-count limitations. The memorandum is 8,669 words, inclusive of all footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this certification. I have relied on the word-count function of the word-processing software used to prepare this memorandum.

/s/ Trevor Dellno Keeth

Trevor Dellno Keeth, Pro se Plaintiff
P.O. Box 7087
Rochester, MN 55903
(507) 321-9740
trevor.keeth@2tokens.com

28